## Atlantic Cement Company, Inc., Appellant, v Fidelity & Casualty Company of New York et al., Respondents.

First Department, February 22, 1983

### APPEARANCES OF COUNSEL

*Robert L. Tofel* of counsel (*Paula B. Fenton* with him on the brief; *Fine, Tofel, Saxl, Berelson & Barandes, P.C.,* attorneys), for appellant.

*Robert E. Quirk* of counsel (*Richard H. Bakalor* with him on the brief; *Quirk & Bakalor, P.C.,* attorneys), for Travelers Indemnity Company, respondent.

*Harvey A. Hyman* of counsel (*Marshal N. Birnbaum* on the brief; *Barry, McTiernan & Moore,* attorneys), for Fidelity & Casualty Company of New York, respondent.

### OPINION OF THE COURT

Alexander, J.

Atlantic Cement Company, Inc. (Atlantic) appeals from a judgment dismissing its complaint against the defen-

dants, the Fidelity & Casualty Company of New York (Fidelity) and the Travelers Indemnity Company (Travelers), entered December 1, 1981, upon a jury verdict finding that Atlantic intentionally caused harm to the abutting landowners and thus was excluded from coverage under the Fidelity and Travelers policies.

Before commencing operation of its $45,000,000 cement plant located in Ravena, New York, in September, 1962, Atlantic procured from Fidelity a comprehensive general liability policy providing for coverage of $300,000/1,000,000 against liability for physical injury to or physical destruction of tangible personal property caused by an "occurrence". In an indorsement attached to the policy replacing the printed language which indicated that the policy insured against damages "caused by accident", the word "occurrence" was defined to "include * * * accident and also [to mean] * * * any unforeseen event or continuous or repeated exposure to harmful conditions which cause physical injury to or physical destruction of tangible property." The indorsement also deleted condition 3(D) of the policy — Assault and Battery — and substituted therefore, the following language: "[t]his policy does not apply to liability arising from intentional harms committed by or at the direction of the insured." Fidelity was obligated to defend Atlantic in any action against it alleging a covered injury. The policy provided further that "[i]f the insured's alleged liability arises out of a continuous or repeated exposure to harmful conditions, the insurance afforded hereunder shall be applicable only if the first day of the first exposure to such conditions occurs during the policy period. All consequences of a continuous harmful condition shall be considered the result of a single occurrence."

Thereafter in 1964, Atlantic procured coverage from Travelers virtually identical to that obtained from Fidelity. The limits of liability were $300,000/1,000,000 and the loss "caused by accident" provision of the printed policy was replaced by a special indorsement covering liability arising from an "occurrence", defined as meaning an accident or continuous or repeated exposure to conditions which result in destruction of tangible property. While the

Travelers policy also exempted from its coverage "injury caused intentionally by or at the direction of the insured", it did not track the Fidelity policy's requirement that the first day of the first exposure to the continuous or repeated harmful condition occur during the policy period. The Travelers policy also obligated the carrier to defend Atlantic in any action alleging a covered injury.

Atlantic's operation of its plant caused considerable damage to the nearby property owners, eight of whom brought suit in September, 1965, alleging damages to their property from dust and blasting vibrations. These cases came to be known collectively as the *"Boomer"* case. The complaints alleged causes of action in both negligence and nuisance. Atlantic notified Fidelity and Travelers of the lawsuit and requested that they undertake the defense. Both companies declined to defend Atlantic, disclaiming coverage under the policies for damages that might accrue to the *Boomer* plaintiffs as a result of the nuisance claims. These disclaimers purportedly were based on the "intentional harm" exclusionary provisions of the policies. Nevertheless, Atlantic, Fidelity and Travelers agreed to each bear one third of the legal fees and expenses of the *Boomer* cases, but without prejudice to the insurer's right to deny responsibility under the policy. With the approval of Fidelity and Travelers, Atlantic retained counsel to defend the *Boomer* actions and the cases ultimately went to trial before Special Term in Albany County.

The trial court found that Atlantic's operation constituted a nuisance despite the fact that every available precaution was taken to prevent damage to the nearby property owners. Because of the extraordinary investment made by Atlantic in constructing the plant and the economic contribution by that plant to the surrounding area, the trial court refused to grant an injunction, but rather awarded temporary damages to the plaintiffs. (See *Boomer v Atlantic Cement Co.*, 55 Misc 2d 1023.)

In affirming the judgment below the Appellate Division, Third Department (30 AD2d 480) noted the extensive efforts of Atlantic to prevent offensive emissions and discharges from the plant as well as the benefits to the

surrounding community from the presence of the plant in this area.

Noting that substantial damages had been occasioned to the surrounding landowners by the operation of the Atlantic plant at Ravena, the Court of Appeals reversed the lower courts (26 NY2d 219) and directed that an injunction be granted that would be vacated upon the payment by Atlantic of permanent damages to the surrounding landowners, which damages were to be determined by the trial court upon remand. Only one of the eight actions went to trial following the remand and that case (*Kinley v Atlantic Cement Co.,* 72 Misc 2d 834) resulted in a verdict of $175,000 to the plaintiffs, which together with interest and a special award resulted in a judgment against Atlantic in the sum of $244,487.56. The seven remaining actions were settled for a total sum of $466,250. These sums, totaling in all some $710,737.56, are the amounts sought to be recovered by Atlantic as against Fidelity in its first cause of action and as against Travelers in its second cause of action. It appears that in spite of the agreement that Atlantic, Fidelity and Travelers would each bear one third of the legal fees and expenses incurred in respect to this *Boomer* litigation, neither Travelers nor Fidelity paid their full share of the legal fees and expenses although some partial payments were made. In consequence, Atlantic sought, in the third cause of action, to recover the balances due from Fidelity and Travelers under the agreement to share the legal expenses and fees and in the fourth cause of action, to recover those sums paid by Atlantic as legal fees and expenses under the theory that Fidelity and Travelers had a duty to defend under the policies which they breached and thus are liable for these expenses and fees as damages. The claims embraced in the third and fourth causes of action were settled below and are not involved in this appeal.

The defendants contended below and urge on this appeal that the findings by the courts in the *Boomer* litigation that Atlantic had created a nuisance, causing intentional rather than "accidental" harm to the adjoining landowners, triggered the intentional harm exclusionary clauses of the policies and not only relieved the defendants of any

obligation to defend Atlantic in the *Boomer* litigation, but relieved them of liability under the policies as well. Although the court below declined to direct a verdict in favor of the defendants on the theory of collateral estoppel on the question of intentional harm, thus implicitly rejecting this argument by the defendants, it nevertheless charged the jury that:

"[t]he whole issue boils down to the very simple question: Did Atlantic construct and/or maintain this nuisance with an intent to substantially interfere with and damage its Boomer neighbors.

"If you find that Atlantic knew or should have known that its operation could cause contamination, vibrations, etc., which would substantially damage its neighbors and took a calculated risk believing that this would not happen, then you cannot say that this was an intentional act as the word is used in the policy and the acts must be deemed an accident or covered occasion or occurrence and Atlantic is entitled to be indemnified if you so find with respect to the questions that I will present to you.

"However, if you find that Atlantic in the operation of its plant acted with a purpose of causing damage to its neighbors or knew when it acted that damages would be resulting, or would be substantially certain to result to its neighbors from its conduct, then you must find that Atlantic acted intentionally and that it is thereby excluded by the insurance policies, from having any recovery against the defendants."

The court below submitted four special questions to the jury, three of which related to the reasonableness of the settlements made by Atlantic with the seven *Boomer* litigants. The first question asked: "Did Atlantic intend to cause harm or injury to the property of the plaintiffs in the Boomer litigation?" The jury initially inquired of the court as to whether a point of time was relevant in respect to this question but before that inquiry was responded to by the court, the jury returned a verdict answering this first question in the affirmative on a vote of 5 to 1. The other three questions concerning the reasonableness of the settlements made by Atlantic with the *Boomer* plaintiffs were

thus rendered academic; whereupon the court dismissed the plaintiff's complaint.

The trial court's formulation of the question for the jury on the issue of Atlantic's intent, coupled with that portion of its charge quoted above inappropriately confused "intent" as that concept relates to the law of nuisance and "intent" as it relates to contracts of indemnification and insurance.

There can be no question but that as to the *Boomer* plaintiffs, the operation of Atlantic's Ravena plant constituted a nuisance i.e., an invasion of their interest in the private use and enjoyment of their land. " 'An invasion of another's interest in the use and enjoyment of land is intentional when the actor (a) acts for the purpose of causing it; or (b) knows that it is resulting or is substantially certain to result from his conduct' ". (*Copart Inds. v Consolidated Edison Co. of N. Y.*, 41 NY2d 564, 571.)

■ We hold however that "intentional" as used in the exclusionary clauses in these policies does not have the broad sweep and expansive meaning of "intentional" as that word is used in the law of nuisance and conclude that Atlantic was entitled to a directed verdict indemnifying it for the damages recovered against it in the *Kinley* action, said damage having been "accidentally caused".

While it cannot be gainsaid that Atlantic *intended* to operate its cement plant at Ravena, that does not mean that they thereby "intended" to cause damage to the property of the surrounding landowners, nor on its record can it be said that it was substantially certain that such damage would result from the operation of this plant. It should be remembered that the *Boomer* court found, and no contradictory evidence has ever been adduced, that Atlantic took every available precaution in the construction of its Ravena plant to prevent damage to nearby property owners. Indeed the evidence here consisted in the larger part, of testimony by Atlantic's witnesses as to the state of the art and the precautions taken by Atlantic to prevent particulate emission and the other damage to the surrounding landowners.

It is well established in our jurisprudence that it is not "legally impossible to find accidental results flowing from

intentional causes, i.e., that the resulting damage was unintended although the original act or acts leading to the damage were intentional" (*McGroarty v Great Amer. Ins. Co.*, 36 NY2d 358, 364). Indeed the classic example frequently cited in support of this proposition is that of the motorist who "intentionally" runs the red light and causes an intersection collision, considered thereafter by all and sundry to have been an "accident".

Applying this analysis to a claim seeking recovery under a life insurance policy covering loss of life "caused by accident" where death resulted from the "intentional" self-injection of an excessive dose of heroin, the Court of Appeals rejected the insurer's argument that recovery should be denied because of a policy clause barring recovery where death resulted from "intentional self-inflicted injury", stating: "For instance, though one who drives a car while drunk, metaphorically may be said to be 'committing suicide', it does not necessarily follow that his resulting death is to be regarded as 'intentional' * * * Thus, in the case before us, while it may be inferred that the decedent's introduction of heroin into his body was intentional, there is no proof whatsoever that he intended it to have fatal consequences * * * Such an appreciation of the reality of things requires that the word 'accident' in the policy here to be deemed to pertain not only to an intentional or unexpected event which, if it occurs, will foreseeably bring on death, but equally to an intentional or expected event which unintentionally or unexpectedly has that result". (*Miller v Continental Ins. Co.*, 40 NY2d 675, 676-678).

Moreover in interpreting insurance contracts, the courts are enjoined to construe the policies according to the reasonable expectation and purpose of the ordinary businessman when making an ordinary business contract (*Bird v St. Paul Fire & Mar. Ins. Co.*, 224 NY 47, 51; *IQ Originals v Boston Old Colony Ins. Co.*, 85 AD2d 21; cf. *Johnson Corp. v Indemnity Ins. Co. of North Amer.*, 7 NY2d 222). And where there are ambiguities in the insurance policy those ambiguities must be construed against the insurer since policies of insurance, drawn as they ordinarily are by the insurer, are to be liberally construed in favor of the insured. This is especially true when dealing with exclusion-

ary provisions of insurance policies. As was held by the Court of Appeals in *Thomas J. Lipton, Inc. v Liberty Mut. Ins. Co.* (34 NY2d 356, 361): "It is fundamental that ambiguities in an insurance policy must be construed against the insurer * * * This is particularly so as to ambiguities found in an exclusionary clause * * * We cannot think that, given the economic and factual setting in which these policies were written, an ordinary businessman in applying for insurance and reading the language of these policies when submitted, would not have thought himself covered against precisely the damage claims now asserted".

In the policies under consideration here the word *occurrence* was defined to include accident and also to mean "any unforeseen event or continuous repeated exposure to harmful conditions which cause physical injury to or physical destruction of tangible property." Thus the coverage of the policies was expanded so as to broaden the concept of accident and to define an occurrence that would be an event within the coverage of the policy. In this circumstance, it would strain credulity (and defy reality) to believe that Atlantic "in applying for [this] insurance and reading the [amended] language of these policies when submitted, would not have thought [itself] covered against precisely the damage claims" asserted in the *Boomer* actions.

Atlantic argues that as to the sums paid to the seven *Boomer* plaintiffs with whom it settled, recovery should be had as a matter of law since the carriers wrongfully refused to provide it with a defense in those actions. It cites the familiar rule that an insurers' duty to defend is much broader than its duty to indemnify and contends that since the *Boomer* complaint alleged a negligence theory of recovery which was clearly within the policy coverage, the defendants breached that duty and are liable for legal fees and expenses incurred by the insurer in defending the action as well as any reasonable settlement of the claims made by the insured.

To state the proposition however, is to demonstrate the fallacy of the argument for recovery of those settlement sums as a matter of law. Where the insurer wrongfully

refuses to provide the insured with a defense, the insurers' liability extends only to those *reasonable* sums paid in settlement. (*Rosen & Sons v Security Mut. Ins. Co. of N. Y.*, 31 NY2d 343, 347.) Here Atlantic's "settlement" entailed its purchase of the properties of these seven *Boomer* plaintiffs, whereas its obligation under the Court of Appeals decision was to pay permanent damages (past, present and future) for the economic loss to the land caused by its operations. Whether or not this was a "reasonable" disposition of those claims under the circumstances is an issue of fact for a jury's determination.

Accordingly, the judgment of the Supreme Court, New York County (EDMOND SHEA, J., upon jury verdict) entered December 1, 1981, dismissing the plaintiff's complaint should be reversed on the law, with costs, the first and second causes of action of the complaint reinstated and the plaintiff's motion for judgment notwithstanding the verdict on said first and second causes of action granted to the extent of directing entry of an interlocutory judgment in the sum of $244,487.56, and the case remanded to Supreme Court, New York County, for a new trial limited to the issue of the reasonableness of the settlements made by Atlantic in the lawsuits brought against it by the abutting landowner claimants as set forth in paragraph 15 of the complaint herein.

MURPHY, P. J., KUPFERMAN and BLOOM, JJ., concur.

Judgment, Supreme Court, New York County, entered on December 1, 1981, unanimously reversed, on the law, the first and second causes of action of the complaint reinstated and the plaintiff's motion for judgment notwithstanding the verdict on said first and second causes of action granted to the extent of directing entry of an interlocutory judgment in the sum of $244,487.56, and the case remanded to Supreme Court, New York County, for a new trial limited to the issue of the reasonableness of the settlements made by plaintiff-appellant in the lawsuits brought against it by the abutting landowner claimants as set forth in paragraph 15 of the complaint herein. Appellant shall recover of respondents one bill of $75 costs and disbursements of this appeal.