**CONTINENTAL INSURANCE COMPANY and Hartford Fire Insurance Company, Plaintiffs, Appellants,**

v.

**ARKWRIGHT MUTUAL INSURANCE COMPANY, Defendant, Appellee.**

No. 96–1596.

United States Court of Appeals, First Circuit.

Heard Oct. 10, 1996.

Decided Dec. 19, 1996.

James T. Hargrove, with whom Thomas M. Elcock, Boston, Richard W. Jensen, Somerville, and Morrison, Mahoney & Miller, Boston, were on brief, for appellants.

William Gerald McElroy, with whom Catherine M. Colinvaux, Waltham, and Zelle & Larson LLP were on brief, for appellee.

Before CYR, BOUDIN and STAHL, Circuit Judges.

CYR, Circuit Judge.

Appellants Continental Insurance Company ("Continental") and Hartford Insurance Company ("Hartford") (collectively: "C & H" or "appellants") challenge the district court's summary judgment ruling under New York law that damage from flooding was not covered under the insurance policy issued by Arkwright Mutual Insurance Company ("Arkwright" or "appellee"). As the district court correctly applied New York law, we affirm.

# I

## BACKGROUND

In 1992, Olympia and York Development Company, L.P. ("Olympia") owned a high-rise office building at 55 Water Street, New York, New York ("Water Street Building"). On December 11th of that year, a severe storm struck New York City, causing the Hudson and East Rivers to overflow their banks. Flood waters entered the basement of the Water Street Building through cracks in its foundation, resulting in more than one million dollars in property damage. Slightly more than half the damage involved energized electrical switching panels which had come into contact with the flood waters. The water immediately caused a phenomenon known as "electrical arcing"[1]—an electrical short circuit, in lay terms—which in turn caused an immediate explosion that blew large holes in the switching panels. C & H appraised the damage to the switching panels at $581,225. Much of the remaining damage, appraised at $445,592, occurred when the flood waters came in contact with non-energized electrical equipment; it involved no electrical arcing.

At the time of the storm, three separate policies provided various coverages for the Water Street Building. Two of the policies—identical "all risk" policies separately issued by appellants Continental and Hartford—insured against "all risks including Flood and Earthquake" up to $75,000,000 per occurrence for the one-year period beginning March 3, 1992. Each policy underwrote fifty percent of the $75,000,000 "all risk" coverage on identical terms and conditions, and contained a $100,000 deductible for any loss and damage arising out of each covered occurrence. In addition, each "all risk" policy excluded coverage for mechanical or electri-

---

[1]. Electrical arcing is defined as "the movement of electrons from one point to another." *Aetna Ins. Co. v. Getchell Steel Treating Co.*, 395 F.2d 12, 17 (8th Cir.1968) (citing Van Norstrand, *International Dictionary of Physics and Electronics;* Palmer, Craig and Easton, *World Book Encyclopedia*). Electrical arcing "produces heat and light, but does not involve the combustion of matter." *Id.*

cal breakdown caused by artificially generated electrical currents.[2]

The third policy, issued by appellee Arkwright, a Massachusetts corporation, afforded $3,000,000,000 in total liability coverage for the three-year period between January 1, 1992 and January 1, 1995, on approximately forty buildings owned by Olympia around the world. As concerns the Water Street Building in particular, the Arkwright policy afforded up to $100,000,000 in covered property loss from flooding, subject to a $75,000,000 deductible. Thus, the Arkwright policy principally served as *excess* "all risk" coverage *above* the $75,000,000 liability limit on the two separate "all risk" policies issued· by appellants Continental and Hartford.

· The Arkwright policy on the Water Street Building included a "Special· Deductible Endorsement," which afforded *primary* insurance coverage for mechanical or electrical breakdown by substituting a $50,000 deductible for the $75,000,000 "all risk" deductible in the Arkwright policy. The $50,000 Special Deductible Endorsement was subject to the following qualifications:

> In the event of insured loss or damage under the policy to which this endorsement is attached, *the Loss · or Damage described below shall be subject to the following deductible amount(s) in lieu of any other Policy deductible amount(s) except those for Flood,* Earthquake or Service Interruption *if applicable:*
>
> [*$50,000.00* ]
>
> \*      \*      \*      \*      \*      \*
>
> 3.  *Loss or damage from* mechanical or *electrical breakdown* (except by direct lightning damage) of any equipment, unless physical damage not excluded results, in which event this Special Deduct-

ible shall not apply to such resulting damage. (Emphasis added.)

Olympia submitted claims to appellants Continental and Hartford for the total loss sustained at the Water Street Building. It maintained that the entire loss had been caused by flooding and therefore came within the coverage afforded under the two primary "all risk" policies issued by appellants. Continental and Hartford promptly paid $937,557 to Olympia, representing coverage for the entire loss less· a $100,000 deductible, then claimed reimbursement from Arkwright for the $581,225 loss to the electrical switching panels allegedly caused by electrical arcing. Arkwright refused to contribute, contending that all damage to the Water Street Building had been caused by, or resulted directly from, flooding. Relying on the Special Deductible Endorsement language—"in lieu of any other Policy deductible amount(s) except those for Flood"—Arkwright insisted that since the damage had been due to flood, the $50,000 deductible in its endorsement did not displace the $75,000,000 deductible in its policy.

Continental and Hartford instituted this diversity proceeding in United States District Court for the District of Massachusetts, seeking a judicial declaration that Arkwright was liable for the portion of the electrical switching panel loss due to electrical arcing. After all parties moved for summary judgment based on their respective interpretations of the applicable New York caselaw, the district court concluded that under the Arkwright insurance contract, including its Special Deductible Endorsement, as viewed by a reasonable business person in the relevant circumstances, *see Bird v. St. Paul Fire & Marine Ins. Co.,* 224 N.Y. 47, 120 N.E. 86

---

2.  The policies· stated, in pertinent part:
    8.  *Perils Insured Against*
    This policy insures against all risk of direct physical loss of or damage to property described herein except as hereinafter excluded.
    9.  *Perils Excluded*
    This policy does not insure:
    ·      \*      \*      \*      \*      \*·      \*
    c.  against electrical injury or disturbance to electrical appliances, devices, or wiring caused

by electrical currents artificially generated unless loss or damage from a peril insured ensues and then this policy shall cover for such ensuing loss or damage.

(1918), the damage to the electrical switching panels had been caused by flooding.[3]

The district court determined that in identifying the cause of the storm-related damage to the electrical switching panels, a reasonable business person would not have segregated the flooding from the arcing. The court based its conclusion on the fact that the $50,000 deductible is made inapplicable to flood loss by the express language in the Special Deductible Endorsement, excluding electrical breakdown due to flood, as well as the fact that all the damage occurred virtually simultaneously at the same site.

## II

### DISCUSSION [4]

Appellants Continental and Hartford challenge the district court ruling that the flooding, rather than the electrical arcing, constituted the legal cause of the damage to the electrical switching panels. Their proximate causation analysis focuses upon what point in the "proverbial chain of causation" a particular cause ceases to be remote and becomes the "legal cause" of the damage. *See* Richard A. Fierce, *Insurance Law–Concurrent Causation: Examination of Alternative Approaches,* 1985 S. Ill. U. L.J. 527, 534 (1986).

#### 1. *Causation under New York Law*

Appellants first contend that the district court misapplied New York law in ruling that a reasonable business person would consider the switching panels to have been damaged by flood rather than electrical arcing. Under established New York law governing insurance contract interpretation, appellants maintain, the district court was required to identify the most direct, physical cause of the damage, or what is termed "the dominant and proximate cause." *Novick v. United Servs. Auto. Ass'n,* 639 N.Y.S.2d 469, 471 (App.Div.1996). According to appellants, the most direct, physical cause of a loss under New York law "is that which is nearest to the loss because [it] is invariably the most direct and obvious cause."

Appellants predicate their contention principally upon *Home Ins. Co. v. American Ins. Co.,* 147 A.D.2d 353, 537 N.Y.S.2d 516 (1989), where water and steam precipitated electrical arcing which in turn damaged electrical equipment in a high-rise building. There the New York Supreme Court, Appellate Division, held that electrical arcing, not steam, caused the damage, since the steam "merely set the stage" for the subsequent arcing and therefore constituted the remote, rather than the proximate, cause of the loss. *Id.,* 537 N.Y.S.2d at 517 ("'[T]he causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings ....'") (quoting *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.,* 505 F.2d 989, 1006 (2d Cir.1974)). Similarly, appellants maintain that the efficient, legal cause of the damage to the switching panels in the present case was the electrical arcing, whereas the flooding merely set the stage for the arcing.[5] Consequently,

---

3. The parties stipulated, consistent with established "choice of law" principles, that New York law governs. Under the law of Massachusetts, the forum state, the applicable substantive law would be supplied by New York, the jurisdiction with the most significant relationship to the transaction. *See Bi-Rite Enterprises v. Bruce Miner Co.,* 757 F.2d 440, 442–43 (1st Cir.1985).

4. We review a grant of summary judgment *de novo. Alexis v. McDonald's Restaurants of Mass., Inc.,* 67 F.3d 341, 346 (1st Cir.1995). It will be upheld if the record, viewed in the light most favorable to the nonmoving party, shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Moreover, we may affirm the district court judgment "on any independently sufficient ground."

*Polyplastics, Inc. v. Transconex, Inc.,* 827 F.2d 859, 860–61 (1st Cir.1987).

5. Appellants cite numerous cases for the proposition that the efficient, legal cause of a loss invariably is the cause "nearest" the loss. *See, e.g., Kosich v. Metropolitan Property & Cas. Ins. Co.,* 214 A.D.2d 992, 626 N.Y.S.2d 618 (1995) ("efficient and dominant cause" of damage from asbestos contamination held to be contamination itself and not the chain-saw's cutting into floor which precipitated asbestos release); *Album Realty Corp. v. American Home Assur. Co.,* 80 N.Y.2d 1008, 592 N.Y.S.2d 657, 607 N.E.2d 804, 805 (1992) (loss following rupture of frozen sprinkler head not caused by freezing but by resulting flooding); *Loretto–Utica Properties Corp. v. Douglas Co.,* 642 N.Y.S.2d 117, 118 (App.Div. 1996) (loss following heaving of frozen ground

appellants conclude, the district court need have looked no further than the phenomenon of electrical arcing for the legal cause of the damage to the switching panels.

We turn to the language in the Arkwright insurance contract to determine whether the damage to the switching panels was legally caused by flooding or electrical arcing. Under New York law, insurance policies are to be interpreted in accordance with their terms. *See, e.g., Frey v. Aetna Life & Cas.,* 221 A.D.2d 841, 633 N.Y.S.2d 880, 882 (1995).

In cases involving an electrical breakdown not caused by lightning, the Special Deductible Endorsement substitutes a $50,-000 deductible for the $75,000,000 deductible in the Arkwright liability policy proper, except in cases where the higher deductible for "Flood" is "applicable." Appellants would have the court interpret the operative provision ("in lieu of any other Policy amount(s) except those for Flood ... if applicable") to mean that the $75,000,000 deductible in the Arkwright liability policy proper applies only if there is a separate, specific policy deductible for flood damage. Absent such a specific deductible for flood damage, appellants say, the *exception* for loss from flooding found in the $50,000 Special Deductible Endorsement is never triggered; therefore, the electrical breakdown damage to the switching panels comes within the $50,000 Special Deductible Endorsement, displacing the $75,000,000 deductible in the Arkwright policy itself.

Appellants misinterpret the plain language in the Special Deductible Endorsement, which unambiguously indicates that the $50,000 deductible does *not apply* if another deductible for flooding damage *does apply.* Furthermore, the "all risk" general liability coverage in the Arkwright policy itself expressly insures against "loss or damage resulting from a single occurrence," including flood. Thus, the plain language employed in both the Special Deductible Endorsement and the Arkwright general liability policy itself, compatibly interpreted in context, means that damage to mechanical or electrical equipment proximately caused by flooding comes within the *exception* to the $50,000 Special Deductible Endorsement and hence the $75,000,000 deductible in the Arkwright general liability policy applies in such a situation. *See, e.g., Harris v. Allstate Ins. Co.,* 309 N.Y. 72, 127 N.E.2d 816, 817 (1955) ("words of the policy are to be read in context, the language construed fairly and reasonably with an eye to the object and purpose to be achieved by the writing"); *Moshiko, Inc. v. Seiger & Smith, Inc.,* 137 A.D.2d 170, 529 N.Y.S.2d 284, 287 (1988) (policy endorsements to be read in context of general liability provisions). "Where the provisions of the policy are 'clear and unambiguous, they must be given their plain and ordinary meaning....,'" *United States Fidelity & Guar. Co. v. Annunziata,* 67 N.Y.2d 229, 501 N.Y.S.2d 790, 492 N.E.2d 1206, 1207 (1986) (quoting *Government Employees Ins. Co. v. Kligler,* 42 N.Y.2d 863, 864, 397 N.Y.S.2d 777, 366 N.E.2d 865 (1977)).[6]

not caused by freezing but by movement of earth); *Morgan Guar. Trust Co. v. Aetna Cas. & Sur. Co.,* 199 A.D.2d 72, 604 N.Y.S.2d 952, 953 (1993) (damage following flooding, caused not by flooding but by resulting corrosion); *Pan Am. World Airways, Inc.,* 505 F.2d at 1006–07 (settled caselaw has established a "mechanical test of proximate causation for insurance cases, a test that looks only to the 'causes nearest the loss,'" and not to "remote causes of causes") (quoting *Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co.,* 263 U.S. 487, 492, 44 S.Ct. 175, 176, 68 L.Ed. 402 (1924) (Holmes, J.)).

**6.** Appellants' interpretation, on the other hand, renders the exception to the Special Deductible Endorsement mere surplusage and therefore is disfavored. *See Technicon Elec. Corp. v. American Home Assur. Co.,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 533–34, 542 N.E.2d 1048, 1050–51 (1989) (rejecting interpretation which would render exclusion clause meaningless in context); *Utica Mut. Ins. Co. v. Preferred Mut. Ins. Co.,* 180 A.D.2d 195, 583 N.Y.S.2d 986, 987 (1992) (similar). In cases involving an electrical breakdown, the language of the Special Deductible Endorsement triggers the $50,000 deductible "in lieu of any other Policy amount(s) except those for Flood ... if applicable." As noted above, appellants argue that the phrase "other Policy amounts" should be read to mean other specific deductible amounts not including the $75,000,-000 general deductible in the Arkwright general liability policy. But since no other deductible amount for flood exists in the Arkwright policy covering the Water Street Building, and appellants have not been able to demonstrate the existence of any other special flood deductible in

## 2. *Legal Cause of Loss*

Given the plain language in the Arkwright insurance contract, we must determine the proximate or legal cause of the damage to the switching panels, bearing in mind that "[t]he concept of proximate cause when applied to insurance policies is a limited one," especially under New York law. *Great N. Ins. Co. v. Dayco*, 637 F.Supp. 765, · 778 (S.D.N.Y.1986).[7] Moreover, in the context of an insurance contract, our inquiry may not proceed beyond the dominant, efficient, physical cause of the loss. *Home Insurance*, 537 N.Y.S.2d at 517. Ultimate causation—or what the Second Circuit has referred to as the "metaphysical beginnings"—is not our concern. *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1006 (2d Cir.1974).

That is not to say, as appellants suggest, that the court is constrained to settle upon the cause nearest the loss without regard to other factors.[8] Rather, we are " 'to follow the chain of causation so far, and so far only as the parties meant that we should follow it.' " *Album Realty Corp. v. American Home Assur. Co.*, 80 N.Y.2d 1008, 592 N.Y.S.2d 657, 658, 607 N.E.2d 804, 805 (1992) (quoting *Goldstein v. Standard Acc. Ins. Co.*, 236 N.Y. 178, 183, 140 N.E. 235, 236 (1923)). In its seminal discourse on the "loss causation" inquiry under an insurance contract, the New York Court of Appeals charted the course: "[O]ur guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business con-tract. It is his intention, expressed or fairly to be inferred, that counts. There are times when the law permits us to go far back in tracing events to causes." *Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47, 120 N.E. 86, 87 (1918) (Cardozo, J.).[9]

The *Bird* case involved a fire insurance contract on a vessel. Within the policy period, a fire of unknown origin broke out beneath some freight cars loaded with explosives and located at a considerable distance from the pier where the insured vessel was docked. After burning for approximately 30 minutes, the freight cars exploded, causing another fire, which in turn caused a second explosion, the concussion from which damaged the insured vessel located some 1,000 feet from the site of the second explosion. No fire reached the vessel. *Id.*, 120 N.E. at 86. Then–Judge Cardozo, writing for New York's highest court, employed a pragmatic, "commonsense appraisement" of the circumstances, *id.* at 87 (citation and internal quotation marks omitted), in determining as a matter of law that coverage of the concussion damage sustained by the vessel could not be said to have been within the "range of probable expectation" under a policy which protected against fire. *Id.* at 88.

The critical consideration in *Bird* was the "element of proximity in space." *Id.* at 87. As the initiating event—the fire in the freight cars—occurred a great distance from the insured vessel, the court held that "there was never exposure to its direct perils" and

---

the entire Arkwright policy covering Olympia properties in general, their interpretation would mean that the phrase "in lieu of other Policy amounts" is "mere surplusage"—as, indeed, appellants concede in their brief.

7. Arkwright maintained at oral argument that the Special Deductible Endorsement excludes arcing whenever flood is the remote as well as the proximate cause of the damage. Its contention fails, since the required plain language interpretation dictates an end to our inquiry at proximate causation.

8. Nor does *Pan Am. World Airways, Inc., supra.*, support appellants' position. It held that proximate causation is determined by a "mechanical ... test that looks only to the *causes* nearest to the loss." 565 F.2d at 1007 (emphasis added). Its use of the plural permits more than one cause to be considered. Moreover, even the language used by the district court in *Great N. Ins. Co. v. Dayco* is qualified; viz., "*generally* [we] are to stop our inquiries with the cause nearest to the loss," 637 F.Supp. 765, 778 (S.D.N.Y.1986) (emphasis added), making the rule something less than a mechanical mandate.

9. As appellants acknowledge, *Bird* remains good law to this day, and continues to be cited for its discussions on intent and proximate causation. *See* R. Dennis Withers, *Proximate Cause and Multiple Causation in First–Party Insurance Cases*, 20 Forum 256, 261 (January 1985) (citing *Atlantic Cement Co., Inc. v. Fidelity & Cas. Co. of N.Y.*, 91 A.D.2d 412, 459 N.Y.S.2d 425 (1983); *Ace Wire & Cable Co. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 469 N.Y.S.2d 655, 457 N.E.2d 761 (1983)); *see also Album Realty Corp.*, 607 N.E.2d at 804; *Pan Am. World Airways, Inc.*, 505 F.2d at 1006.

that the exposure to its indirect perils—i.e., the concussion from the second explosion—came "only through the presence of extraordinary conditions, the release and intervention of tremendous forces of destruction." *Id.* Consequently, the court concluded, reasonable business people would not have expected that an insurance policy affording protection against fire would cover damage to a vessel following successive concussions precipitated by explosions caused by the fire in the distant freightyard.. As the Court of Appeals stated:

> The case comes, therefore, to this. *Fire must reach the thing insured, or come within such proximity to it that damage, direct or indirect, is within the compass of reasonable probability. Then only* is it the proximate cause, because then only *may we suppose that it was within the contemplation of the contract.*

*Id.* at 88 (emphasis added).

■ In sum, absent an explicit policy declaration of the parties' intention, the contemplation of their insurance contract must be inferred by the court from all the circumstances surrounding the loss, including whether a peril insured against came directly or indirectly within such proximity to the property insured that the damage it sustained fairly can be considered "within the compass of reasonable probability." *Id.* Among the factors which must be assessed are the spatial and temporal proximity between the insured peril and the claimed loss. *See* R. Dennis Withers, *Proximate Cause and Multiple Causation in First—Party Insurance Cases,* 20 Forum 256, 260 (January 1985) (*Bird* considers "proximity of a cause as a judgment to be made upon matters of fact," including "proximity in space.").

■ Our case involves no spatial or temporal attenuation at all comparable to that present in *Bird.* The flood waters came *directly* in contact with the electrical equipment in the Water Street Building, *instantaneously* precipitating the arcing which in turn caused the *immediate* short-circuiting and explosion that damaged the switching panels. At most, mere seconds would have elapsed from the time the flood waters di-rectly contacted the electrical equipment until the electrical switching panels exploded.

Where any spatial and temporal separation between the covered peril and the ensuing loss is so minimal as to be virtually nonexistent, *Bird* clearly contemplates that the loss be considered well within the "compass of reasonable probability" and therefore inferentially within the contemplation of the parties to the insurance contract. *See Bird,* 120 N.E. at 88. Consequently, given the absence of any significant spatial separation or temporal remoteness between the insurgent flood waters, the electrical arcing and the explosion of the switching panels, we believe the district court correctly concluded that flooding proximately caused the loss.

More recent New York caselaw continues implicitly to recognize the significance of what the Court of Appeals in *Bird* called the "element of proximity in space," *see id.* at 87, as well as the temporal element. In *Home Insurance,* for example, the Court of Appeals recently held *electrical arcing* to be the proximate cause of damage where arcing had been precipitated by a gradual intrusion of moisture. The court elucidated upon its analysis as follows:

> There was *no flow of water directly onto the bus duct system. Rather,* the *moisture saturated* the duct *insulation* and supports, *which had deteriorated due to age and environment,* resulting in breakdown of the insulation and *permitting an arc to result . . . .* Upon review of the record before this Court, we find that . . . *the steam merely set the stage for the later event.*

*Home Ins. Co.,* 537 N.Y.S.2d at 517 (emphasis added). This passage distinguishes an intrusion of water and steam into a basement, gradually causing moisture to seep through deteriorating building materials into a duct, from a situation in which water flows directly onto an electrical system, causing immediate arcing and damage to the electrical system. In *Home Insurance,* substantial time and space separated the peril (the water and steam entering the basement) from the eventual electrical damage to the duct system resulting from the moisture gradually generated by the water and steam. Also

interposed between the peril and the damage in *Home Insurance* were the deteriorating insulation and supports, which gave rise to a considerably greater spatial separation than occurred here. "There is no use in arguing that distance ought not to count if life and experience tell us that it does." *Bird*, 120 N.E. at 87.

Thus, neither *Bird* nor *Home Insurance* involved circumstances similar to the present, where flood waters flowed directly onto electrical equipment, immediately precipitating in turn the instantaneous electrical arcing, the short-circuiting, and the explosion which damaged the switching panels. Accordingly, as the district court correctly ruled, the insurgent flood waters cannot reasonably be thought simply to have "set the stage" for a remote event, or to have been merely some metaphysical beginning to a succession of temporally remote events.

Temporal remoteness and spatial separation distinguish many recent New York cases cited by appellants.[10] Given the importance placed upon temporal remoteness and spatial separation in *Bird*, 120 N.E. at 88, the wellspring decision under New York law, we conclude that the district court correctly held that the legal cause of the damage to the electrical switching panels was the flooding, not electrical arcing.[11] We therefore hold that a reasonable business person would consider that the damage sustained by the electrical switching panels in the Water Street Building, just as any other water damage to the building, was caused by flood. That is to say, as then-Judge Cardozo did, since the flood waters surged onto the site of the loss, a reasonable business person would consider the damage to the electrical switching panels to have been "within the danger zone of ordinary experience," *see id.* at 87, and consequently would expect the Continental and Hartford flood policy coverages, not the Arkwright Special Deductible Endorsement, to afford Olympia indemnification for the loss. Thus, the exception to the Arkwright Special Deductible Endorsement applies.

### 3. *Appropriateness of Summary Judgment*

Finally, we turn briefly to appellants' alternate contention. Continental and Hartford argue that the inquiry into the dominant and efficient cause of the loss presents a question of fact inappropriate for summary judgment. Once again, we disagree.

■ Generally speaking, the determination as to which of two causes was the dominant and efficient cause of a loss is for the factfinder. *See, e.g., Molycorp, Inc. v. Aetna Cas. & Sur. Co.*, 78 A.D.2d 510, 431 N.Y.S.2d 824, 825–26 (1980); *Novick*, 639 N.Y.S.2d at 471. The trial courts in the cited cases, however, were presented with a factual question as to which of the two perils *physically caused* the loss. In our case, on the other hand, there is *no dispute* concerning the physical, as distinguished from the legal, cause of the damage—i.e., what physical phenomenon precipitated the alteration to the

10. *See, e.g., Morgan Guar. Trust Co. v. Aetna Cas. & Sur. Co.*, 199 A.D.2d 72, 604 N.Y.S.2d 952, 953 (1993) (microbiologically-induced corrosion occurring over one-year period, rather than remote flooding which initiated corrosion, held proximate cause of damage to electrical duct); *Album Realty Corp.*, 607 N.E.2d at 805 (electrical damage precipitated by water which was emitted by frozen sprinkler and filled basement, held to have been caused not by freezing but by the more proximate flooding). Such temporal and spatial considerations likewise distinguish other New York cases not involving electrical breakdown. *See, e.g., Kosich v. Metropolitan Property & Cas. Ins. Co.*, 214 A.D.2d 992, 626 N.Y.S.2d 618 (1995) (contractor's cutting into vinyl flooring with chain saw merely "set in motion a chain of events that ultimately resulted" in loss from asbestos contamination); *Pan Am. World Airways,*

*Inc.*, 505 F.2d at 1006–07 (in airline hijacking case, general history of unrest throughout Middle East, extending through three wars and several countries, is too remote to be considered cause for loss under "war risk" insurance due to "reasonable expectations of businessmen").

11. Although the district court relied upon a conversion theory derived from *Bird*—i.e., that the exception to the Special Deductible Endorsement converted a more remote cause into the proximate cause—it concluded as well that any temporal and spatial separation between the flood and the damage to the switching panels had been virtually nonexistent. In all events, we may affirm on any ground supported by the record. *Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859, 860–61 (1st Cir.1987).

electrical switching panels.[12]  As the New York Court of Appeals explained in *Bird:* "For the physicist one thing is cause, for the jurist, another."  *Bird,* 120 N.E. at 88. Thus, the question before this court, as in *Bird,* is the question of *law* already resolved above: What would the New York courts determine to have been the legal or proximate cause of the loss?  Like the district court, we hold that flood was the legal cause of the loss in this case.

## III

### CONCLUSION

As the district court correctly applied the controlling New York law, the judgment is *affirmed.  Costs are awarded to appellee.*

### SO ORDERED.

---

12.  As support for their claim that trialworthy issues of fact remain, appellants point to a letter written to Arkwright by David Passman, an insurance broker for Olympia.  The Passman letter is said to contradict the affidavit of Olympia's risk manager, David Roth, who filed the claim for loss against appellants only, based on his understanding that all the damage stemmed from flooding within the contemplation of their policies.  But though the Passman letter contends that the Arkwright policy affords coverage, it does not assert that the physical damage was facilitated by any phenomenon other than flood, nor does it take issue with the sequence of events as found by the district court.  Thus, the Passman letter raised no trialworthy issue.  *See Guzman–Rivera v. Rivera–Cruz,* 29 F.3d 3, 4 (1st Cir.1994).