[Cite as *Sherwin-Williams Co. v. Certain Underwriters at Lloyd's London*, 2022-Ohio-3031.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| THE SHERWIN-WILLIAMS COMPANY, | : | |
| | | No. 110187 |
| Plaintiff-Appellant/ Cross-Appellee, | : | |
| v. | : | |
| CERTAIN UNDERWRITERS AT LLOYD'S LONDON, ET AL., | : | |
| Defendants-Appellees/ Cross-Appellants. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** September 1, 2022

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-06-585786

### *Appearances:*

Jones Day, Mark J. Andreini, and John E. Iole, pro hac vice; Hilow & Spellacy and James R. Wooley, *for appellant*.

Burns, White L.L.C., Kevin C. Alexandersen, Daniel J. Michalec, and Brooke L. Hamilton; Charles E. Spevacek, *for appellee and cross-appellant* Great American Insurance Company.

Cavitch, Familo & Durkin Co., LPA and Gregory E.

O'Brien; Shipman & Goodwin LLP, James P. Ruggeri, Joshua D. Weinberg, and Joshua P. Mayer, pro hac vice, *for appellees and cross-appellants* First State Insurance Company, Nutmeg Insurance Company, and Twin City Fire Insurance Company.

Isaac Wiles & Burkholder & Teetor, LLC, and Jay B. Eggspuehler; Mendes & Mount, LLP, Matthew B. Anderson, and Daniel J. Wityk, pro hac vice, *for appellee and cross-appellant* Certain London Market Companies.

Kaufman, Drozdowski & Grendell LLC and Arthur Kaufman; CNA Coverage Litigation Group and Edward J. Tafe, pro hac vice: Dentons US L.L.P., M. Keith Moskowitz, Kristen C. Rodriguez, and Shannon Y. Shin, pro hac vice, *for appellees and cross-appellants* Columbia Casualty Company, Continental Casualty Company, The Continental Insurance Company.

Marshall, Dennehey, Warner, Coleman & Goggin and David J. Fagnilli; Clyde & Co US, Paul Koepff, pro hac vice, and Ryan Winchester; O'Malveny & Myers and Jonathan Hacker, pro hac vice, *for appellees and cross-appellants* Century Indemnity Company, Westchester Fire Insurance Company, and Federal Insurance Company.

McCarthy, Lebit, Crystal & Liffman Co., LPA and David A. Schaefer; Zuckerman, Spader LLP, Carl S. Kravitz, Caroline E. Reynolds, and Nicholas M. DiCarlo, pro hac vice; Kohrman, Jackson & Krantz, LLP, and Maribeth Meluch, *for appellees and cross-appellants* Certain Underwriters at Lloyd's London; World Marine and General Insurance Corporation Ltd.; World Auxiliary Insurance Company Ltd.; The Victory Insurance Company Ltd.; New London Reinsurance Company Ltd.; Scottish Lion Insurance Company Ltd.; Winterthur Swiss Insurance Company; Yasuda Fire & Marine Insurance Company (UK) Ltd.; Yasuda UK; Lamorak Insurance Company; Government Employee Insurance Company; and Berkshire Hathaway Direct Insurance Company.

Roetzel & Andress, LPA, Emily K. Anglewicz, and Bradley

L. Snyder; McCarthy, Lebit, Crystal & Liffman Co., LPA and David A. Schaefer; Zuckerman Spader LLP, Carl S. Kravitz, Caroline E. Reynolds, and Nicholas M. DiCarlo; Walker Wilcox Matousek LLP, Robert P. Conlon, and Alla Cherkassky Galati, *for appellee and cross-appellant* Westport Insurance Corporation.

Weston | Hurd LLP and Gary W. Johnson; Crowell & Moring LLP and Laura A. Foggan, pro hac vice, *for appellees and cross-appellants* TIG Insurance Co., North River Insurance Company, Mt. McKinley Insurance Co., and United States Fire Insurance Co., and American Alternative Insurance Corporation.

Aronberg Goldgehn Davis & Garmisa, Lisa J. Brodsky and Mithcell S. Goldgehn, pro hac vice, for *appellee and cross-appellant* Allstate Insurance Company.

William & Silvaggio and Anna M. Sossa, for *appellee and cross-appellant*, Employers Mutual Casualty Company.

Roetzel & Andress, LPA, and Ronald B. Lee; Chaffetz Lindsey LLP, Charles J. Scibetta, and Theordore R. DeBonis, pro hac vice, for *appellee and cross-appellant* American Home Assurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, and The Insurance Company of the State of Pennsylvania.

MARY J. BOYLE, P.J.:

**{¶ 1}** The crux of this insurance coverage case is whether The Sherwin-Williams Company's ("Sherwin-Williams") insurers[1] (collectively "Insurers") will

---

[1] The Insurers are Certain Underwriters at Lloyds, London; All Co. Listed After Allianz G.R. US. Ins. Co.; Allianz Global Risks US Ins. Co.; Allstate Ins. Co.; American Alternative Ins. Co.; American Casualty Co. of Reading, Pennsylvania; American Home Assurance Co.; American Zurich Ins. Co.; Arrowood Indemnity Co.; Central National Ins. Co. of Omaha; Century Indemnity Co.; Certain Underwriters at Lloyds, London and Certain London Market Cos.; Employers Mutual Casualty Co.; First State Ins. Co.; Great American Ins. Co.; Gulf Ins. Co.; Illinois Exchange; Kemper Ins. Co.; Lamorak Ins. Co.;

cover Sherwin-Williams' liability arising from litigation in Santa Clara County, California for the abatement of lead paint used in California residences. Sherwin-Williams and two other paint manufacturers, NL Industries, Inc. ("NL") and ConAgra Grocery Products Company ("ConAgra"), were ordered to pay over $400 million into an abatement fund ("the Abatement Fund") to be used by California cities and counties to mitigate the hazards caused by lead paint in homes predating 1951, including identifying lead hazards, removing lead dust, and preventing further deterioration of lead paint.[2] *Cty. of Santa Clara v. Atlantic Richfield Co.*, 137 Cal.App.4th 292, 40 Cal.Rptr.3d 313 (2006) ("*Santa Clara I*") and *People v. ConAgra Grocery Prods. Co.*, 17 Cal.App.5th 51, 227 Cal.Rptr.3d 499 (2017) ("*Santa Clara II*") (collectively the "*Santa Clara* Action"). The insurance coverage issue has not yet been litigated in Ohio but has been litigated in two other jurisdictions — *Certain Underwriters at Lloyd's London v. ConAgra Grocery Prods. Co., LLC*, 77 Cal.App. 5th 729, 292 Cal.Rptr.3d 712 (2022) ("the *ConAgra* Action") in California and *Certain Underwriters at Lloyd's London v. NL Industries, Inc.*, N.Y. App.No. 650103/2014, 2020 N.Y. Misc. LEXIS 10905 (Dec. 29, 2020) ("*NL I*") and *Certain*

Mt. McKinley Ins. Co.; National Union Fire Ins. Co. of Pittsburg, Pennsylvania; North River Ins. Co.; Nutmeg Ins. Co.; Travelers Casualty & Surety Co.; Westport Ins. Co.; and Westport Ins. Corp.

[2] The total amount to be paid into the fund was reduced to $401,122,482 after an offset for payment by another lead paint manufacturer no longer in the case. On July 10, 2019, the parties executed a settlement agreement under which ConAgra, NL, and Sherwin-Williams "each agreed to pay $101,666,666 in full satisfaction of any and all claims." *Certain Underwriters at Lloyd's London v. ConAgra Grocery Prods. Co., LLC*, 77 Cal.App. 5th 729, 292 Cal.Rptr.3d 712, 729 (2022).

*Underwriters at Lloyd's, London v. NL Industries, Inc.*, 164 N.Y.S.3d 607, 203 A.D. 3d 595 (2022) ("*NL II*") (collectively the "*NL* Action") in New York.

**{¶ 2}** In the case at hand, Sherwin-Williams filed a motion for partial summary judgment against National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), asking the court to declare coverage for liability in the *Santa Clara* Action under a single insurance policy. According to Sherwin-Williams, it chose this single policy to "respond first" under the authority of *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.,* 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 12 (The plaintiff "should be permitted to choose, from the pool of triggered primary policies, a single primary policy against which it desires to make a claim. In the event that this policy does not cover [the plaintiff's] entire claim, then [the plaintiff] may pursue coverage under other primary or excess insurance policies.").

**{¶ 3}** The Insurers also filed for summary judgment, asking the court to declare that there is no coverage under the multiple policies issued to Sherwin-Williams for liability in the *Santa Clara* Action. Additionally, the parties filed a joint statement of undisputed facts. On December 4, 2019, the trial court granted summary judgment in favor of the Insurers. We find the decisions in the *NL* Action more persuasive and conclude that the trial court erred by granting the Insurers' motions for summary judgment. Therefore, we reverse and remand.

# I. Relevant Background

## A. The *Santa Clara* Action

### 1. *Santa Clara I*

**{¶ 4}** In March 2000, Santa Clara County brought an action against Sherwin-Williams and other manufacturers and promoters of lead paint, including NL and ConAgra, in *Santa Clara I*. Multiple California governmental entities joined the lawsuit, and the complaint was amended on several occasions, alleging claims for strict product liability, negligence, and fraud. The plaintiffs also alleged two public nuisance claims (1) on behalf of a class of California municipalities ("the class public nuisance claim") and (2) on behalf of people of the state of California ("the representative public nuisance claim").[3] The plaintiffs sought damages and abatement of the public nuisance. Eventually, the *Santa Clara I* Court granted summary judgment for Sherwin-Williams and the other companies that produced lead paint on the majority of the claims and granted the defendants' demurrer as to the two public nuisance claims.[4] The plaintiffs appealed.

**{¶ 5}** On appeal, the court affirmed the dismissal of the class public nuisance claim, but reversed the grant of the demurrer as to the representative

---

[3] The representative public nuisance claims alleged that lead is present in homes, buildings, and other property throughout the state of California. As the remedy, the counties sought abatement on behalf of the People, not reimbursement for specific property damage, bodily injury, or costs of remediation. *Santa Clara I* at 309.

[4] "'A demurrer tests the sufficiency of the plaintiff's complaint, i.e., whether it states facts sufficient to constitute a cause of action upon which relief may be based.'" *Two Jinn, Inc. v. Govt. Payment Serv., Inc.*, 233 Cal.App.4th 1321, 1343, 183 Cal.Rptr.3d 432 (2015), quoting *Young v. Gannon*, 97 Cal.App.4th 209, 213, 118 Cal.Rptr.2d 187 (2002).

public nuisance claim. The appellate court ordered the lower court to "(1) vacate its order sustaining the demurrer to the representative public nuisance claim in the third amended complaint and enter a new order overruling the demurrer to that cause of action, and (2) vacate its order granting summary judgment and enter a new order granting summary adjudication on the [unfair business practices] cause of action and denying summary adjudication on the negligence, strict liability and fraud causes of action." *Santa Clara I* at 333.

{¶ 6} In reinstating the representative public nuisance claim, the *Santa Clara I* Court differentiated the representative claim from the class claim. The court stated, "[h]ere, the representative cause of action is a public nuisance action brought on behalf of the People seeking abatement. Santa Clara, [San Francisco], and Oakland are not seeking damages for injury to their property or the cost of remediating their property." *Id.* at 309. The court then distinguished a representative public nuisance claim, which seeks "future abatement," from a products liability claim, which "does not provide an avenue to prevent future harm from a hazardous condition." *Id.* at 310. The court noted that the actionable conduct for the representative public nuisance claim is "distinct from and far more egregious than simply producing a defective product or failing to warn of a defective product." *Id.* at 309. The court likened a nuisance claim "to instructing the purchaser to use the product in a hazardous manner." *Id.*

{¶ 7} In January 2014, after a trial on the sole claim, the lower court issued a decision finding Sherwin-Williams and codefendants, ConAgra and NL, jointly

and severally liable and ordering them to abate the nuisance. In March 2014, the court amended its decision and issued a judgment requiring Sherwin-Williams, NL, and ConAgra to pay $1.15 billion into the Abatement Fund, which was later reduced to $401,122,482.[5]

### 2. *Santa Clara II*

**{¶ 8}** Sherwin-Williams and other lead paint defendants who were found liable appealed the judgment, raising several challenges to their liability, including that the judgment was "not supported by substantial evidence of knowledge, promotion, causation, or abatability." *Santa Clara II*, 17 Cal.App.5th at 66, 227 Cal.Rptr.3d 499 (2017).

**{¶ 9}** The *Santa Clara II* Court addressed the evidence collected by the lower court concerning the sale of lead paint, its extensive use in homes in the ten jurisdictions at issue in the lawsuit, and the health hazards posed by lead paint to the children in those homes. The *Santa Clara II* Court noted that in many of the represented counties, lead poisoning from lead paint is the number one environmental health issue affecting children. *Id.* at 74-76. The court stated:

> [c]hildren in the 10 jurisdictions are continuing to be exposed to lead from the lead paint in their homes and to suffer deleterious effects from that lead. Although only a small percentage of the children in these jurisdictions are screened for lead, thousands of children are found to have BLLs [blood lead levels] of concern each year.

*Id.* at 74.

---

[5] This sum includes "an offset for payment by another lead paint manufacturer no longer in the case[.]" The *ConAgra Action*, 77 Cal. App. 5th at 737, 292 Cal.Rptr.3d 712 (2022).

{¶ 10} The *Santa Clara II* Court affirmed, as it did in *Santa Clara I*, that "[c]onstructive knowledge would not be sufficient to support plaintiff's public nuisance cause of action" and that the standard set in *Santa Clara I* was "actual knowledge." *Id.* at 83. Thus, "[l]iability [wa]s premised on defendants' *promotion of lead paint for interior use **with knowledge of the hazard*** that such use would create." *Id.* (Emphasis sic.)

{¶ 11} The court acknowledged the trial court's findings that Sherwin-Williams, ConAgra, and NL had "'actual knowledge of the hazards of lead paint — including childhood lead poisoning' when they produced, marketed, sold, and promoted lead paint for residential use" and that "defendants 'learned about the harms of lead exposure through association-sponsored conferences'"; they "knew in the 1930s that 'the dangers of lead paint to children were not limited to their toys, equipment, and furniture'"; they knew "both that 'high level exposure to lead — and in particular, lead paint — was fatal' and that 'lower level lead exposure harmed children'"; and "by the 1920s, defendants knew that 'lead paint used on the interiors of homes would deteriorate and that lead dust resulting from this deterioration would poison children and cause serious injury.'" *Id.* at 84-85, quoting the March 26, 2014 Superior Court decision. The trial court's express findings made clear that the "'harms' and 'hazards' of which defendants had actual knowledge included that (1) 'lower level lead exposure harmed children,' (2) 'lead paint used on the interiors of homes would deteriorate,' and (3) 'lead dust resulting from this deterioration

would poison children and cause serious injury.'" *Id.* at 85, quoting the March 26, 2014 Superior Court decision.

{¶ 12} As for the remedy, the *Santa Clara II* Court noted that "'[a]n abatement of a nuisance is accomplished by a court of equity by means of an injunction proper and suitable to the facts of each case.'" *Id.* at 132, quoting *Sullivan v. Royer*, 72 Cal. 248, 249, 13 P. 655 (1887). The court further stated:

> While damages may be available in both public and private nuisance actions, damages are not an available remedy in the type of public nuisance action that was brought by plaintiff in this case, a representative public nuisance action. "[A]lthough California's general nuisance statute expressly permits the recovery of damages in a public nuisance action brought by a specially injured party, it does not grant a damage remedy in actions brought on behalf of the People to abate a public nuisance."

(Brackets sic.) *Id.* at 122, quoting *Koll-Irvine Ctr. Property Owners Assn. v. Cty. of Orange*, 24 Cal.App.4th 1036, 1041, 29 Cal.Rptr.2d 664 (1994).

{¶ 13} Furthermore, the *Santa Clara II* Court rejected the lead paint defendants' argument that the Abatement Fund was "a thinly-disguised damages award" for unattributed past harm to private homes. *Id.* at 132. Rather, the court held that

> An abatement order is an equitable remedy, while damages are a legal remedy. An equitable remedy's sole purpose is to eliminate the hazard that is causing prospective harm to the plaintiff. An equitable remedy provides no compensation to a plaintiff for prior harm. Damages, on the other hand, are directed at compensating the plaintiff for prior accrued harm that has resulted from the defendant's wrongful conduct. The distinction between these two types of remedies frequently arises in nuisance actions. Generally, continuing nuisances are subject to abatement, and permanent nuisances are subject to actions for damages. As Code of Civil Procedure section 731 permits a public entity

plaintiff to seek abatement of a public nuisance in a representative action, the trial court could properly order abatement as a remedy in this case.

*Id.* at 132-133. (Internal citation omitted.)

**{¶ 14}** The Abatement Fund ordered by the trial court complied with this standard because the plaintiffs "did not seek to recover for any prior accrued harm nor did [they] seek compensation of any kind." *Id.* at 133. Rather, the deposits that the trial court required defendants to make into the Abatement Fund "would be utilized not to recompense anyone for accrued harm but solely to pay for the prospective removal of the hazards defendants had created." *Id.*

**{¶ 15}** With regard to homes built post-1950, the *Santa Clara II* Court agreed with the defendants' claim that the record lacked substantial evidence to support the trial court's finding that their wrongful promotions were causally connected to post-1950 homes containing interior lead paint. The court stated,

> While we can accept the inference that defendants' pre-1951 promotions increased the use of lead paint on residential interiors during the period of those promotions, we reject plaintiff's claim that it is a reasonable inference that the impact of those promotions may be assumed to have continued for the next 30 years. We can find no evidence in the record that supports an inference that the promotions of defendants prior to 1951 continued to cause the use of lead paint on residential interiors decades later. We therefore conclude that we cannot uphold the trial court's judgment requiring defendants to remediate all houses built before 1981 because there is no evidence to support causation as to the homes built after 1950.

*Id.* at 106.

**{¶ 16}** As a result, the *Santa Clara II* Court reversed the judgment and remanded the matter back to the trial court to "(1) recalculate the amount of the

abatement fund to limit it to the amount necessary to cover the cost of remediating pre-1951 homes, and (2) hold an evidentiary hearing regarding the appointment of a suitable receiver." *Id*. at 169.

**{¶ 17}** Sherwin-Williams and the other defendants attempted to have the *Santa Clara II* decision reviewed by the California Supreme Court and the United States Supreme Court, but both courts denied their petitions. *See People v. ConAgra Grocery Products Co.*; *The Sherwin-Williams Co.*, 2018 Cal. LEXIS 1277 (2018), and *ConAgra Grocery Prods. v. California*, 139 S.Ct. 377, 202 L.Ed.2d 288 (2018).

## B. The *ConAgra* Action

**{¶ 18}** In the interim, just after the trial court filed its decision in the *Santa Clara* Action in January 2014, ConAgra's insurers filed a first amended complaint for declaratory relief, seeking a determination that they had no coverage obligation to ConAgra with respect to the *Santa Clara* Action. *ConAgra*, 77 Cal. App. 5th at 737, 292 Cal.Rptr.3d 712 (2022). The insurers moved for summary judgment arguing that they had no duty to provide coverage.

**{¶ 19}** The trial court granted summary judgment in favor of the insurers, holding that

> Insurance Code section 533 precluded coverage as a matter of law because it "'precludes indemnification for liability arising from deliberate conduct that the insured expected or intended to cause damage'"; "'willful act of insured' includes an act 'intentionally performed with knowledge that damage is highly probable'" (quoting *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 742–743 [15 Cal. Rptr. 2d 815] (Shell Oil)); and courts in the underlying litigation "clearly and repeatedly found" that "Fuller intentionally promoted lead paint with knowledge that damage to children was at least highly probable." The court specifically rejected ConAgra's

arguments that it was "only Fuller's 'purported' successor"; that ConAgra, as successor, could be "'insulated from its predecessor's knowledge'"; that the scienter findings in the underlying litigation were insufficient to meet the willfulness standard in section 533; that Fuller's conduct was merely reckless; that the insurers were required to, and did not, prove Fuller's senior managers knew the hazards of lead paint; and that *Santa Clara II* erred in requiring remediation of lead paint applied after 1950 in homes built before 1950.

(Brackets sic.) *Id*. at 738.

**{¶ 20}** ConAgra appealed this decision arguing that California law precludes coverage for losses due to a willful act of "the insured" and ConAgra did not commit a wrongful act. *Id*. at 740. The court affirmed the trial court's judgment, stating that

the underlying litigation established that Fuller — the [predecessor] corporate entity — had actual knowledge of the harms associated with lead paint when it promoted lead paint for interior residential use. We have already concluded that this actual knowledge finding necessarily means Fuller acted with knowledge that lead paint was "substantially certain" or "highly likely" to result in the hazard found to exist in the underlying litigation, and therefore established the willful act required to trigger section 533 prohibition against insurance coverage. ConAgra's argument that the knowledge required for application of section 533 required proof of what knowledge was held by specific individuals within the company is in effect a challenge to factual determinations made in the underlying litigation that are now final and binding. As we have said, an insurer's duty to indemnify is determined by the actual basis of liability imposed on the insured. ([*Armstrong World Industries, Inc. v. Aetna Cas. & Sur. Co.*, 45 Cal.App.4th 1, 108, 52 Cal.Rptr.2d 690 (1996)].) Since the findings establishing that liability also establish the willful act required for application of section 533, ConAgra's position is untenable.

*Id*. at 752.

## C. The *NL* Action

### 1. *NL I*

#### a. Occurrence

**{¶ 21}** In *NL I*, the insurers brought a declaratory judgment action to determine coverage for NL's liability arising from the *Santa Clara* Action. The defendants moved for summary judgment, seeking a declaration that they have no coverage obligation to defendant NL.

**{¶ 22}** The insurers asserted the following three grounds for declaratory judgment: (1) "NL is not entitled to coverage because it was held liable in the [*Santa Clara*] Action for intentionally and affirmatively promoting lead paint for interior residential use with actual knowledge of the public health hazard that it would create"; (2) "the policies at issue only cover 'damages' or 'damages and expenses,' and the abatement remedy ordered in the [Santa Clara] Action is neither"; and (3) "even if the abatement remedy is deemed as covered 'damages' or 'expenses,' there is still no coverage because the policies also require that liability was imposed 'for,' 'because of' or 'on account of' 'property damage' or 'bodily injury' and neither 'property damage' nor 'bodily injury' were elements of the claim for which NL was held liable." *NL I*, 2020 NY Slip Op 34331(U) at 2. NL, on the other hand, argued "that it is entitled to coverage for its liability in the [*Santa Clara*] Action pursuant to the policies issued or subscribed by plaintiffs, insurer defendants, and nominal defendants." *Id*. at 17.

**{¶ 23}** Some of the policies submitted by the insurers included language indicating that harms resulting from "accidents" or "occurrences" are covered. Certain policies defined an occurrence as

> "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured" (NYSCEF 387, Summary of Policies at 3 [definition of occurrence 1970-1971 primary policy (Employers Commercial Union Policy No. CLE-Y9004-663)]; *see also id.* at 4-5 [definition of occurrence 1978-1979 primary policy (INA Policy No. SCG1020)]). Another policy defines an "occurrence" as "(a) an accident, or (b) an event, or continuous or repeated exposure to conditions, which results during the policy period, in personal injury, property damage, or advertising liability (either alone or in combination) neither expected nor intended from the standpoint of the Insured" (*id.* at 9 [definition of occurrence 1970-1973 umbrella policy (Commercial Union Policy No. EY-9004-671)]). Other policies state that they cover "liability . . . for damages . . . by reason of Bodily Injury, Personal Injury, Property Damage, [or] Advertising Injury" "resulting from an Accident" (*id.* at 13 [1986-1987 excess policy (Lloyd's Policy 6KA36140)]) and expressly exclude coverage for injuries or damage 'which the Insured intended or expected or reasonably could have expected'" (*id.* at 15).

> Some of the policies only cover awards of "damages" against NL. As to this issue, NL's insurance policies fall into two broad categories. The first includes policies limited to liability imposed as or for "damages." Many of these policies cover NL for all sums which [NL] shall be obligated to pay by the reason of liability . . . for damages" (*id.* at 11 [1979-1982 umbrella policy (London Policy No. 881/ULL0304)]). The second group of policies provide coverage both for "damages" and certain "expenses." These policies cover sums NL becomes "obligated to pay by reason of the liability imposed upon [it] by law . . . for damages . . . and expenses," (*id.* at 8 [1970-1973 umbrella policy (Commercial Union Policy No. EY-9004-671)]) as more fully defined by the term "ultimate net loss," which in turn is defined as sums NL must pay (1) by reason of . . . property damage . . . either through adjudication or compromise," and (2) as "expenses . . . for litigation, settlement, adjustment, and investigation of claims and suits." (*id.*; see also *id.* at 11 [1979-1982 umbrella policy (London Policy No. 881/ULL0304)]).

(Brackets sic.) *NL I* at 18-20.

**{¶ 24}** The *NL I* Court addressed the meaning of the terms "expected or intended harms" and "damages or expenses." With regard to the "intentional and expected acts," the insurers argued that NL is not entitled to coverage because it was held liable in the [*Santa Clara*] Action for promoting lead paint with the actual knowledge that it would cause harm. The Insurers asserted that under the language of the policies at issue and the fortuity doctrine, coverage is not available for an expected or intended harm. *Id.* at 26.[6]

**{¶ 25}** The *NL I* Court noted that not all the policies contained an expected or intended harm exclusion, and to determine whether NL is seeking coverage for an occurrence or accident that unintentionally or unexpectedly resulted in injury, the court must consider what conduct supported a finding of liability in the *Santa Clara* Action. *Id*. at 33. The court reasoned that, under New York Law, what "'makes injuries or damages expected or intended rather than accidental are the knowledge and intent of the insured. It is not enough that an insured was warned that damages might ensue from its actions, or that, once warned, an insured decided to take a calculated risk and proceed as before[.]'" *Id*. at *31-32, quoting *Johnstown v. Bankers Std. Ins. Co.*, 877 F.2d 1146, 1150 (2d Cir.1989).

---

[6] ""Broadly stated, the fortuity doctrine holds that "insurance is not available for losses that the policyholder knows of, planned, intended, or is aware are substantially certain to occur"' (*Chase Manhattan Bank v New Hampshire Ins. Co.*, 193 Misc 2d 580, 587, 749 N.Y.S.2d 632 [Sup Ct, NY County 2002], quoting Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 8.02, at 248 [5th ed. 1991]). New York has codified a narrower version of the doctrine (*id*.; see New York Insurance Law § 1101 [a])." (Brackets sic.) *NL I* at *37.

**{¶ 26}** The court noted that "'it is a well-established insurance principle that there can be liability coverage for an insured's liability arising out of his own intentional act if the resulting injury or damage caused was not intended.' (*id.*)." *Id.* at *32. The *NL I* Court stated,

> "In attempting to define what events are 'accidental,' the New York courts have focused on the nexus between an intentional act and the resulting damage. As this court has observed, the distinction is drawn between 'damages which flow directly and immediately from an intended act, thereby precluding coverage, and damages which accidentally arise out of a chain of unintended though expected or foreseeable events that occurred after an intentional act. Ordinary negligence does not constitute an intention to cause damage; neither does a calculated risk amount to an expectation of damage[.]'"

> (*City of Johnstown*, N.Y., 877 F.2d at 1150 [citations omitted]). "[I]t is not legally impossible to find accidental results flowing from intentional causes, i.e., that the resulting damage was unintended although the original act or acts leading to the damage were intentional" (*Atlantic Cement Co.Fidelity and Cas. Co. of N.Y.*, 91 AD2d 412, 417-418, 459 N.Y.S.2d 425 [1st Dept 1983] [citation omitted]; *see also Slayko v Security Mut. Ins. Co.*, 98 N.Y.2d 289, 293, 774 N.E.2d 208, 746 N.Y.S.2d 444 [2002] [citation omitted] ["insurable 'accidental results' may flow from 'intentional causes'"]). The general rule remains that "more than a causal connection between the intentional act and the resultant harm is required to prove that the harm was intended" (*Slayko*, 98 NY2d at 293 [internal quotation marks and citation omitted]).

(Brackets sic.) *Id.* at 32-33.

**{¶ 27}** The *NL I* Court further noted that "'[t]he duty to defend is measured against the allegations of pleadings but the duty to pay is determined by the actual basis for the insured's liability to a third person[.]'" *Id.* at 33, quoting *Servidone Constr. Corp. v. Security Ins. Co. of Hartford*, 64 N.Y.2d 419, 424, 477 N.E.2d 441, 488 N.Y.S.2d 139 (1985). The *NL I* Court reasoned:

In *Santa Clara II*, the Court of Appeal acknowledged the Superior Court's findings that NL "'learned about the harms of lead exposure through association-sponsored conferences'"; "knew in the 1930s that 'the dangers of lead paint to children were not limited to their toys, equipment, and furniture'"; knew "both that 'high level exposure to lead — and in particular, lead paint — was fatal' and that 'lower level lead exposure harmed children'"; and that "by the 1920s, defendants knew that 'lead paint used on the interiors of homes would deteriorate and that lead dust resulting from this deterioration would poison children and cause serious injury.'" (17 Cal App 5th at 85, quoting the March 26, 2014 Superior Court decision). The Superior Court found that NL obtained this knowledge through its review of scientific and medical literature, certain trade associations' communications and meetings, and its own experiences (NYSCEF 380, Trial Court's Amended Statement of Decision at 29). NL even "employed medical doctors who were well aware of the hazards of lead paint and tracked the medical literature on this subject" (*id.*). The Court of Appeal held that these findings supported the trial court's determination that NL must have known by the early 20th Century that lead paint posed a very serious risk (17 Cal App 5th at 85).

The Court of Appeal also acknowledged the Superior Court's finding that NL affirmatively promoted lead paint for interior use despite knowing of the dangers. The Court of Appeal upheld this finding stating

"[s]ubstantial evidence supports the trial court's finding that NL affirmatively promoted lead paint for interior residential use with the requisite knowledge. NL extensively promoted its lead paint for interior residential use from 1915 through 1950. Because NL knew of the danger to children from lead paint on residential interiors no later than 1914, substantial evidence supports the trial court's finding that NL's subsequent promotions of lead paint for such use were done with the requisite knowledge"

(*id.* at 99). The California Courts did not specifically address whether NL intended the damage as result of its actions. In fact, in *Santa Clara II*, the Court of Appeal stated that NL must have known that lead paint posed a serious risk of harm.

(Brackets sic.) *NL I* at *33-35.

**{¶ 28}** Because of the distinction between knowledge of the risk of hazardous consequences of one's actions and the intention to cause harm under New York law, the *NL I* Court found that the insurers failed to meet their burden to exclude coverage on the basis of "expected or intended harms" and failed to make a prima facie case that NL's conduct is uninsurable under policies containing the exclusion. *Id.* at *35.[7] The *NL I* Court found "there is no evidence demonstrating an intent to cause harm when NL promoted the lead paint[.]" *NL I* at 38. As a result, the court found that the insurers did not meet their burden to exclude coverage. *Id.* at *37-38.

### b. Damages

**{¶ 29}** With regard to damages, the insurers argued that the Abatement Fund cannot be construed as "damages" under the policies. They further argued "that the abatement fund ordered in the [*Santa Clara*] Action is not an award to

---

[7] In support of its reasoning, the *NL I* Court cited to *Atlantic Cement Co. v. Fid. & Cas. Co.*, 91 A.D.2d 412, 459 N.Y.S.2d 425 (1983), where

> the First Department held that Atlantic was entitled to indemnification for the damages recovered against it in the underlying action, as those damages were "accidentally caused" (91 AD2d at 417). Of Atlantic's liability, the Court found that

> "[w]hile it cannot be gainsaid that Atlantic intended to operate its cement plant at Ravena, that does not mean that they thereby 'intended' to cause damage to the property of the surrounding landowners, nor on its record can it be said that it was substantially certain that such damage would result from the operation of this plant[.]"

> (id.).

(Brackets sic.) *Id.* at 36.

compensate the government for its losses, but rather, it is a remedy to prevent future harm." *Id.* at 38. The insurers further argued that "the abatement fund qualifies as a prophylactic remedy, which is not covered under the language of the policy." *Id.*

{¶ 30} In opposition, NL argued that that many of the insurance policies at issue do not even contain "as damages" language and "the monies they paid to the abatement fund do qualify as damages, because the only requirement of any judgment in the [*Santa Clara*] Action was that NL pay money; there was no injunctive relief, fine, penalty, restitution, punitive damages or exemplary damages assessed against NL." *Id.* NL further emphasized "the fact that the policies do not expressly exclude coverage for payment of abatement." *Id.*

{¶ 31} The court went on to analyze whether the payment into the Abatement Fund constituted covered damages for insurance recovery purposes. The *NL I* Court concluded that the Abatement Fund had a compensatory effect, which qualified as damages under the applicable law and insurance policies. *Id.* at 42-46. The court noted that other courts have held that a company's payment to help clean up environmental pollution constitutes damages. The court also found that the payment could be reasonably tied to bodily injury or property damage because there was a connection between the physical injuries or property damage and the promotion of the lead paint. The *NL I* Court stated,

> "The tests to be applied in construing an insurance policy are common speech and the reasonable expectation and purpose of the ordinary business[person]" (*Ace Wire Cable Co. v Aetna Cas. & Sur. Co.*, 60 NY2d 390, 398, 457 N.E.2d 761, 469 N.Y.S.2d 655 [1983] [citations omitted]). "If the policy is ambiguous in this respect, any doubt or

uncertainty in its meaning should be resolved against the defendant [insurer]" (*Perth Amboy Drydock Co. v New Jersey Mfrs. Ins. Co.*, 26 AD2d 517, 518 [1st Dept 1966]). Construing "damages" against the Insurers would result in coverage for the abatement costs incurred by NL. Here, an ordinary businessperson reading the policies at issue would believe coverage exists for NL's liability, and NL's liability under the California public nuisance statute constitutes "damages" under the relevant policy language.

* * *

[C]ourts determining coverage have included in the ordinary dictionary definition of "damages" equitable relief, encompassing the costs of government expenditures for environmental cleanup (see *Avondale Indus., Inc. v Travelers lndem. Co.*, 887 F.2d 1200, 2008 [2d Cir 1989] ["Damages, as the district court said, may 'include funds necessary for restoration of third parties' properties"]; *American Motorists Ins. Co. v Leve/or Lorentzen, Inc.*, 1988 WL 112142, 1988 U.S. Dist. LEXIS 11631, *10-11 [2d Cir 1988] [applying New York law]; *Sherwin-Williams Co. v Certain Underwriters at Lloyd's London*, 813 F Supp 576, 587 [ND OH 1993] [holding that abatement cost claims fell within the London Market Insurers' coverage for property damage because harm, caused by lead paint, had been done to the New Orleans Housing Authority's buildings, requiring remedial steps to make them safely habitable]).

(Brackets sic.) *Id.* at 39-40.

**{¶ 32}** The *NL I* Court reasoned that even though the Abatement Fund in the *Santa Clara* Action is technically injunctive relief, this injunctive relief serves substantially the same purpose as reimbursing the government's costs in responding to the lead paint hazard. *Id.* at *41. Because the Abatement Fund was not strictly intended to prevent harm, but rather paid to the government to reimburse monies depleted by its ongoing efforts to remediate the longstanding contamination of houses and buildings by lead paint in California, the *NL I* Court concluded that the Abatement Fund qualifies as damages under the applicable policies. *Id.* at 44-45.

{¶ 33} As to the insurers' argument that "NL is not entitled to coverage since the certain policies require that coverage be for damages or liability that is imposed for, or because of, or on account of property damage, personal injury, bodily injury or advertising injury[,]" the *NL I* Court agreed that property damage and bodily injury are not elements of the representative public nuisance claim, but found that "there is a connection between the lead poison injuries to the children residing in the buildings containing the lead paints promoted by NL and the property damage to those buildings as a result of NL's promotion of lead paint." *Id.* at 46, 48. As a result, the *NL I* Court denied the insurers' motion for summary judgment. *Id.* at 49.

### 2. *NL II*

{¶ 34} In *NL II*, the court affirmed the *NL I* Court's decision denying the insurers' motion for summary judgment seeking a declaration that they had no obligation to cover the Abatement Fund ordered in *Santa Clara II*. The *NL II* Court affirmed the *NL I* Court's finding that there was no evidence demonstrating an intent to cause harm when NL promoted the lead paint even though "NL had 'actual knowledge of the hazards of lead paint' and 'knew' that it would deteriorate and cause serious injury,'" and "NL's acts 'posed a serious risk of harm.'" *NL II* at 595-596. The *NL II* Court held that this "is not a clear finding that NL either expected or intended to harm any person or property." *Id.* at 596, citing *Union Carbide v Affiliated FM Ins. Co.*, 101 A.3d 434, 955 N.Y.S.2d 572 (1st Dept. 2012); *Sherwin-Williams Co. v. Certain Underwriters at Lloyd's London*, 2020 Ohio Misc. LEXIS

802 (Dec. 3, 2020); *Certain Underwriters at Lloyd's of London v. ConAgra Grocery Prods. Co.*, 2020 WL 3096821 (Cal Super, Feb. 26, 2020).

**{¶ 35}** The *NL II* Court concluded that the *NL I* Court "correctly rejected the insurers' argument that there could be no coverage because the settlement payment to the Abatement Fund on the public nuisance claim did not constitute liability for 'damages' or expenses under the policies and New York law." *Id*. The court further concluded that the *NL I* Court "correctly rejected the insurers' argument that the rulings in the *Santa Clara* Action mandated the conclusion that NL's creation of the public health hazard by promoting lead paint use in homes constituted knowing and intentional conduct uninsurable under public policy and the terms of the policies." *Id*. at 595. The *NL II* Court further agreed with the *NL I* Court's rejection of the "insurers' argument that there can be no insurance recovery by parties found liable for representative public nuisance who are required to make payments into an Abatement Fund because their liability is not imposed 'for,' 'because of,' or 'on account of' 'property damage' or 'bodily injury,' as required under the insurance policies." *Id*. at 596. The court stated that "[t]he nuisance liability is based on the widespread bodily injury/property damage that the hazard of lead paint in homes caused and continues to cause." *Id*.

### D. The Instant Action

**{¶ 36}** In 2006, Sherwin-Williams initiated this case seeking a declaration regarding its coverage with the Insurers relative to the *Santa Clara* Action. The case was stayed pending conclusion of the litigation in 2018. The stay in this case was

lifted in 2019, and the parties thereafter filed motions for summary judgment. Sherwin-Williams filed a motion for partial summary judgment, arguing that it is entitled to indemnification by National Union for losses arising from the lead paint claims, including any money paid as a result of the *Santa Clara* Action. The Insurers sought a declaration that they are under no duty to indemnify Sherwin-Williams.

{¶ 37} The trial court articulated the issues it was considering on summary judgment as follows: (1) Is the nuisance in the *Santa Clara* Action an "occurrence" within the meaning of the policies? (2) Is the nuisance in the *Santa Clara* Action an intentional tort, barred from coverage by public policy? (3) Is the Abatement Fund damages? (4) Does Sherwin-Williams' responsibility for the Abatement Fund qualify for expenses under the damages and expenses coverage in certain policies? (5) Is there a duty to provide coverage to Sherwin-Williams for the *Santa Clara* Action judgment and/or settlement?

{¶ 38} In December 2020, the trial court issued an eight-page decision, granting summary judgment in favor of the Insurers and against Sherwin-Williams. Tellingly, the trial court, in granting summary judgment in favor of the Insurers, agreed with Sherwin-Williams that the public-nuisance claim was brought on account of "bodily injury" or "property damage," explaining that there would be no basis for the public nuisance claim if neither bodily injury nor property damage were at issue.

{¶ 39} The trial court first found that there has been an occurrence as defined in the policies "or else there would be no need for an abatement and no

nuisance would exist." (Trial Court's Judgment Entry, Dec. 4, 2020, p. 4.) "An occurrence as defined in the policies is, 'an accident, including continuous or repeated exposure to [a] condition, which result[s] in bodily injury or property damage neither expected nor intended from the standpoint of the insured.'" (Trial Court's Judgment Entry, Dec. 4, 2020, p. 4.)

{¶ 40} The trial court also examined intentional tort law and noted that there is a distinction between intentionally promoting a product and intending or expecting injury or property damage. The court found that Sherwin-Williams "intentionally promoted its product with no expectation or intent to injure" even though it had "actual knowledge of the potential deleterious effects of lead." (Trial Court's Judgment Entry, Dec. 4, 2020, p. 5, 7.) The court further found that "Sherwin-Williams was not substantially certain that injury or property damage would occur due to the promotion of lead containing products." (Trial Court's Judgment Entry, Dec. 4, 2020, p. 7.)

{¶ 41} With regard to damages, the trial court disagreed with Sherwin-Williams' position that the sums it was ordered to pay were "damages" under the policies. The trial court acknowledged that, "[a]t first blush, when a party is required to pay multi-millions of dollars as a result of a final judgment or settlement it automatically looks and sounds like damages." (Trial Court's Judgment Entry, Dec. 4, 2020, p. 6.) The trial court noted that the *Santa Clara II* Court "made a clear statement concerning the distinction between damages and costs of abatement." (Trial Court's Judgment Entry, Dec. 4, 2020, p. 6.) Specifically, the *Santa Clara II*

Court stated that "'The distinction between an abatement order and a damages award is stark'" because "'[a]n abatement order is an equitable remedy, while damages are a legal remedy.'" (Trial Court's Judgment Entry, Dec. 4, 2020, p. 6-7, quoting *Santa Clara II*.) The trial court acknowledged that it did not agree with this statement. In fact, it thought the distinction "counterintuitive and illogical" under the circumstances, when Sherwin-Williams "is required to fund an abatement account to the tune of multi-millions of dollars." (Trial Court's Judgment Entry, Dec. 4, 2020, p. 7.) Nevertheless, the trial court held that it and the parties are bound by the *Santa Clara II* Court's decision. And on that basis alone, it concluded that Sherwin-Williams was not entitled to coverage under the policies. The court stated, "[t]here are no recoverable damages within the definition in the policies" and "[w]ere it not for the fact that there are no recoverable damages, there would be coverage under the insurance policies." (Trial Court's Judgment Entry, Dec. 4, 2020, p. 8.) The court also found that the "defendants had a duty to defend Sherwin-Williams in the *Santa Clara* [Action]." (Trial Court's Judgment Entry, Dec. 4, 2020, p. 7.)

## II. Assignments and Cross-Assignments of Error

{¶ 42} Sherwin-Williams appeals and the Insurers cross-appeal, raising the following assignments of error for review:

Sherwin-Williams' Sole Assignment of Error

The trial court erred in granting summary judgment in favor of Defendants-Appellees, the Insurers, and against Plaintiff-Appellant, Sherwin-Williams, on the ground that there were no recoverable "damages" under the Policies.

All Insurers' Cross-Assignments of Error

Cross-Assignment of Error No. 1: The trial court erred by failing properly to apply Ohio law when analyzing whether Sherwin expected or intended the harm for which it seeks coverage.

Cross-Assignment of Error No. 2: The trial court also erred by finding that Ohio's public policy barring coverage for intentional torts is inapplicable to Sherwin's liability.

Cross-Assignment of Error No. 3: Sherwin's liability was not imposed "because of" bodily injury or property damage.

Cross-Assignment of Error No. 4: Even if the court reversed the "as damages" ruling, Sherwin would not be entitled to a finding that coverage exists.

Insurer Certain London Market Companies Additional Cross-Assignment of Error

Cross-Assignment of Error No. 5: The trial court erred when it stated that "[t]here was a duty to defend [the *Santa Clara* litigation] based upon the allegation in the multiple complaints."

## III. Law and Analysis

### A. Standard of Review

{¶ 43} On appeal, we review a trial court's ruling on a motion for summary judgment de novo, applying the same standard applied by the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.

{¶ 44} Summary judgment is appropriate under Civ.R. 56 when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can only reach a conclusion that is adverse to the

nonmoving party. *Zivich v. Mentor Soccer Club*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 210 (1998), citing *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 653 N.E.2d 1196 (1995), paragraph three of the syllabus.

{¶ 45} On a motion for summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party must then point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. *Id.* at 293.

## B. Collateral Estoppel

{¶ 46} Collateral estoppel prevents parties

> from relitigating facts and issues in a subsequent suit that were fully litigated in a prior suit. Collateral estoppel applies when the fact or issue (1) was actually and directly litigated in the prior action, (2) was passed upon and determined by a court of competent jurisdiction, and (3) when the party against whom collateral estoppel is asserted was a party * * * to the prior action.

*Thompson v. Wing*, 70 Ohio St.3d 176, 183, 637 N.E.2d 917 (1994).

{¶ 47} Collateral estoppel is distinguishable from res judicata. Res judicata has "the effect of precluding * * * [the] relitigating of the same cause of action" whereas collateral estoppel "precludes the relitigation, in a second, action of an *issue* that has been actually and necessarily litigated and determined in a prior action which was based on a different cause of action." (Emphasis sic.) *Whitehead v. Gen. Tel Co.*, 20 Ohio St.2d 108, 112, 254 N.E.2d 10 (1969).

**{¶ 48}** In *NL I*, the court addressed the issue of collateral estoppel and the Insurers' argument that this doctrine is applicable to the factual findings and rulings in the *Santa Clara* Action. The *NL I* Court stated,

> This action was brought to determine whether NL is entitled to insurance coverage for its liability in the [*Santa Clara*] Action. The main issue before this court is the interpretation and application of various insurance policies. However, the findings of the California courts as to NL's liability are closely intertwined with the issue before this court, as whether coverage exists is contingent on certain findings by the California courts such as NL's intent and actual knowledge.
>
> Further, the findings of the California Superior Court are final and binding even though there was a settlement, resulting in the dismissal of the public nuisance claim. In *Santa Clara II*, the Court of Appeal reversed the Superior Court but the reversal was based on the Court of Appeal's conclusion that they could not "uphold the trial court's judgment requiring defendants to remediate all the houses before 1981 because there [was] no evidence to support causation as to the homes built after 1950 (17 Cal App 5th at 89). However, the Court of Appeal upheld the Superior Court's actual knowledge findings. Specifically, the Court of Appeal found that substantial evidence in the record supported the Superior Court's findings that NL had actual knowledge that lead exposure harmed children, that lead paint used in residences would deteriorate, and that the dust resulting from the deterioration would poison children causing serious injury (*id.* at 85)."

*NL I* at 24-26.

**{¶ 49}** Just as in *NL I*, we likewise find that the court's findings in the *Santa Clara* Action that were not reversed remain intact and are final, and collateral estoppel applies to them in the instant case.

**{¶ 50}** As to the first prong of the collateral estoppel test, for example, we find that the issue of Sherwin-Williams' actual knowledge was actually and directly litigated in *Santa Clara II*. Specifically, the court found that substantial evidence in the record supported the trial court's findings that the paint manufacturers had

actual knowledge that lead exposure harmed children, that lead paint used in residences would deteriorate, and that the dust resulting from the deterioration would poison children causing serious injury. *Santa Clara II*, 17 Cal. App. 5th 51 at 85, 227 Cal.Rptr.3d 499 (2017).

{¶ 51} As to the second prong of the collateral estoppel test, those facts were determined by a court of competent jurisdiction. Turning to the third and final prong of the collateral estoppel test, Sherwin-Williams was a party in the *Santa Clara* Action.

{¶ 52} Therefore, we find that collateral estoppel is applicable to the findings in the *Santa Clara* Action that were not reversed, remain intact, and are final. While we find collateral estoppel applicable to the instant case, we also find that the meaning of damages — more specifically, whether the sums that Sherwin-Williams was ordered to pay into the Abatement Fund are covered as damages under the policies — was not actually and directly litigated in the *Santa Clara* Action. Since we find that collateral estoppel does not apply to this issue, we next address the issue of damages.

## C. Sherwin-Williams' Appeal

{¶ 53} The essence of Sherwin-Williams' appeal is whether the monies it was ordered to pay to abate the public nuisance in the *Santa Clara* Action are damages covered under its insurance policies. Sherwin-Williams contends that the trial court in the instant case erred in finding that it was "bound" by the court's decision in *Santa Clara II* regarding damages. According to Sherwin-Williams, the issue here

is "whether, as a matter of Ohio law, a court order to pay money to remediate a hazardous condition causing ongoing harm is 'damages' under the Policies," an issue Sherwin-Williams contends was not addressed by the *Santa Clara* Action.

{¶ 54} As stated above, we have the benefit of the recent coverage decisions in the *ConAgra* Action and the *NL* Action, and, we find the *NL* Action more persuasive and instructive. It deserves mentioning that the trial court in the case at hand did not have the benefit of the *NL* Action opinions prior to releasing its decision.

{¶ 55} Sherwin-Williams' policies with the Insurers provide indemnity coverage for "all sums" Sherwin-Williams becomes "legally obligated to pay as damages" or "for damages." The policies do not expressly define "damages."

{¶ 56} Sherwin-Williams argues that in the absence of a definition, the word damages must be given its "plain and ordinary meaning." And by using its plain and ordinary meaning, "damages" includes the sums Sherwin-Williams was ordered to pay to remediate and abate the presence of lead paint in the *Santa Clara* Action.

{¶ 57} In opposition, the Insurers argue that the *Santa Clara* Action Abatement Fund does not constitute damages because the fund does not compensate the government plaintiffs or anyone else for loss. Rather, they argue the costs imposed are solely to avoid future public health harms that would occur if lead paint remained in the homes. The Insurers further assert that the Abatement Fund qualifies as a prophylactic remedy. As a result, they contend that the Abatement Fund is not covered under the policies.

**{¶ 58}** We note that "'[a]n insurance policy is a contract whose interpretation is a matter of law.'" *Laboy v. Grange Indemn. Ins. Co.*, 144 Ohio St.3d 234, 2015-Ohio-3308, 41 N.E.3d 1224, ¶ 8, quoting *Sharonville v. Am. Emplrs. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 6. As the Ohio Supreme Court has stated, "The fundamental goal when interpreting an insurance policy is to ascertain the intent of the parties from a reading of the policy in its entirety and to settle upon a reasonable interpretation of any disputed terms in a manner designed to give the contract its intended effect." *Id.*, citing *Burris v. Grange Mut. Cos.*, 46 Ohio St.3d 84, 545 N.E.2d 83 (1989). As a result, "[w]ords and phrases must be given their plain and ordinary meaning 'unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.'" *Id.*, quoting *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus. In cases where an insurance contract term is reasonably susceptible of more than one interpretation, we must liberally construe it in favor of the insured. *Id.* at ¶ 9, citing *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380 (1988), syllabus; *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 13.

**{¶ 59}** "Damages" is defined as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Black's Law Dictionary* 416 (8th Ed.2004); *see also Webster's New Universal Unabridged Dictionary* 504 (2003)

(defining "damages" as "the estimated money equivalent for detriment or injury sustained").

**{¶ 60}** The Insurers argue that the "damages" here are equitable in nature and that the *Santa Clara* Action made clear that the plaintiffs in the representative public nuisance claim were not seeking compensation either for bodily injury or property damage on behalf of any individual or for monies spent by the government prior to the action to remediate the ongoing lead paint hazards.

**{¶ 61}** We note, however, that Ohio courts determining insurance coverage issues have included in the ordinary dictionary definition of "damages" equitable relief, which includes the costs of government expenditures for environmental cleanup. *See Sherwin-Williams Co. v Certain Underwriters at Lloyd's London*, 813 F.Supp. 576, 587 (N.D.Ohio 1993) (holding that abatement cost claims fell within the Insurers' coverage for property damage because harm, caused by lead paint, had been done to the New Orleans Housing Authority's buildings, requiring remedial steps to make them safely habitable), citing *Stychno v. Ohio Edison Co.*, 806 F.Supp. 663 (N.D.Ohio 1992) (involving a lease agreement but applying Ohio insurance law); *Kipin Industries, Inc. v. Am. Universal Ins. Co.*, 41 Ohio App.3d 228, 230-231, 535 N.E.2d 334 (1st Dist.1987) (holding that "when the environment has been adversely affected by pollution to the extent of requiring governmental action or expenditure or both for the safety of the public, there is 'property damage' whether or not the pollution affects any tangible property owned or possessed exclusively by the government").

{¶ 62} Moreover, as stated above, we look to the *NL* Action for guidance on the issue of damages since *NL I* squarely addresses the same issues and the same Abatement Fund at issue in this case and provides thoughtful insight into the "damages" conundrum acknowledged by the trial court in its decision.

{¶ 63} In *NL I*, just as in the instant case, the Insurers argued that NL is not entitled to coverage because the settlement payment was not covered damages under the policy and that the Abatement Fund was not tied to a finding that NL is liable for property damage or bodily injury. The *NL I* Court rejected this argument, in its entirety, and denied the Insurers' motion for summary judgment. *NL II* affirmed this denial.

{¶ 64} The issue before the *NL I* Court with regard to damages was whether the Abatement Fund constituted covered damages for insurance recovery purposes. The court concluded that the Abatement Fund had a compensatory effect, which qualified as damages under the applicable law and insurance policies. *Id.* at 44-45. The *NL I* Court noted that other courts have held that a company's payment to help clean up environmental pollution constitutes damages. *Id.* at 40. The *NL I* Court also found that the Abatement Fund could be reasonably tied to bodily injury or property damage because there was a connection between the physical injuries and property damage and the promotion of lead paint. *Id.* at 48.

{¶ 65} The *NL I* Court reasoned that even though the Abatement Fund in the *Santa Clara* Action is technically injunctive relief, this injunctive relief serves substantially the same purpose as reimbursing the government's costs in responding

to the lead paint hazard. *Id.* at \*41. Because the Abatement Fund was not strictly intended to prevent harm but instead directed toward repaying monies depleted by the government's ongoing efforts to remediate the longstanding contamination of houses and buildings by lead paint in California, the *NL I* Court concluded that the Abatement Fund qualified as damages under the applicable policies. *Id.* at \*42. Again, the *NL II* Court affirmed that conclusion.

{¶ 66} Turning to the case at hand, we note that, under Ohio law, "damages" in its plain and ordinary meaning is necessarily broad enough to encompass a variety of remedies, including compensatory damages, injunctive relief, restitution, and other equitable relief. *See Wayne Mut. Ins. Co. v. McNabb*, 2016-Ohio-153, 45 N.E.3d 1081, ¶ 36 (4th Dist.) (finding that the undefined term "damages" is ambiguous and concluding that the equitable remedy of restitution is included in the definition of damages); *Jackson v. Ohio Civ. Rights Comm.*, 50 Ohio App.3d 13, 16, 552 N.E.2d 237 (8th Dist.1989) (finding that "[r]estitution and compensatory damages are synonymous"). Just as the *NL I* Court found, we find that an ordinary businessperson reading the policies at issue would believe that the Abatement Fund constitutes "damages" under the relevant policy language.

{¶ 67} Similar to the *NL* Action's reasoning, we find that the Abatement Fund essentially serves the purpose of reimbursing the government's costs in responding to the lead paint hazard. Indeed, the Abatement Fund was not strictly intended to prevent harm but was monies to be paid to the government to compensate for money depleted by its ongoing efforts to remediate the longstanding

contamination of houses and buildings by lead paint in California. As a result, we find that the monies Sherwin-Williams was ordered to pay into the Abatement Fund qualify as damages under the policies.

{¶ 68} In addition to the *NL* Action, we find *Cincinnati Ins. Co. v. Discount Drug Mart, Inc.*, 2021-Ohio-4604, 183 N.E.3d 538 (8th Dist.), *discretionary appeal allowed*, 166 Ohio St.3d 1524, 2022-Ohio-1893, 188 N.E.3d 182 ("*DDM*") instructive with regard to what "damages" means when Ohio law is applied to the interpretation of an insurance policy. In *DDM*, the same panel as in the instant case addressed damages in the context of a duty to defend a public nuisance action and noted the "scarcity of Ohio cases that provide guidance on whether the type of relief that the counties seek in the underlying litigation are 'damages' within the meaning of commercial general liability insurance policies." *Id.* at ¶ 40. We reviewed a case from the Fourth District Court of Appeals that "found, in the insurance context, the term 'damages' is 'at best' ambiguous." *Id.* at ¶ 41, citing *Wayne Mut. Ins. Co. v. McNabb*, 2016-Ohio-153, 45 N.E.3d 1081, ¶ 40 (4th Dist.). We stated:

> The court explained that it is "'not reasonable to expect that laypersons, corporations, attorneys and insurers who confront the term 'damages' in a myriad of contexts would all attach a common, single meaning to that term[.]'" *Wayne* at ¶ 40, quoting Miller, *Whether Govt. Compelled Cleanup Costs Constitute "Damages" Under CGL Policies: the Nationwide Environmental Liab. Dilemma and a California Model for its Resolution*, 16 Colum.J.Envtl.L. 103-104 (1991). Ambiguous provisions in an insurance policy are construed strictly against the insurer and in favor of the insured, especially if they purport to limit or qualify coverage under the policy. *Westfield Ins. Co. v. Hunter*, 128 Ohio St. 3d 540, 2011-Ohio-1818, 948 N.E.2d 931, ¶ 11.

(Brackets sic.) *Id.*

**{¶ 69}** As a result, we construed the term "damages" against the insurer and in favor of DDM and found, for the purposes of the insurers' duty to defend, that "the payment of money into an abatement fund in this context, although an equitable remedy, arguably or potentially falls within the scope of the insurance policies here." *Id*. at ¶ 42. Similarly, extending the guidance of *DDM* from the realm of a duty to defend to that of a duty to indemnify, we find that Sherwin-Williams's payment into the Abatement Fund qualifies as damages under the applicable policies.[8]

**{¶ 70}** In conclusion of Sherwin-Williams' sole assignment of error, we construe the term "damages" in the Insurers' policies in favor of Sherwin-Williams, in accordance with established principles of Ohio insurance law. *See Westfield* at ¶ 11 ("Ambiguous provisions in an insurance policy must be construed strictly against the insurer and liberally in favor of the insured."). Additionally, we follow the guidance of *NL I* and this court's recent decision in *DDM* to determine that the Abatement Fund constitutes damages under Sherwin-Williams' insurance policies.

**{¶ 71}** Therefore, based on the foregoing, we find that the trial court erred by granting summary judgment in favor of the Insurers, and Sherwin-Williams'sole assignment of error is sustained.

---

[8] The trial court also did not have the benefit of the *DDM* case prior to releasing its decision.

## D. Insurers' Cross-Appeal

**{¶ 72}** In the cross-appeal, the Insurers challenge the following findings the trial court made in its final order: (1) "Sherwin-Williams did not expect or intend for any injury or property damage due to the promotion of lead containing paint products"; (2) "Sherwin-Williams was not substantially certain that injury or property damage would occur due to the promotion of lead containing products"; (3) "[t]he defendants had a duty to defend Sherwin-Williams in the *Santa Clara* case"; and (4) "[w]ere it not for the fact that there are no recoverable damages, there would be coverage under the insurance policies." (Trial Court's Judgment Entry, Dec. 4, 2020, p. 7-8.)

### 1. Intentional and Expected Acts

**{¶ 73}** In the first cross-assignment of error the Insurers contend that because Sherwin-Williams was found liable in the *Santa Clara* Action for promoting lead paint for interior home use, which is a known dangerous use, it had actual knowledge that doing so would cause children to be poisoned. Thus, the Insurers contend, Sherwin-Williams was more than substantially certain that the harm would result from its conduct — it expected or intended the harm.

**{¶ 74}** In *DDM*, we also addressed "expected or intended" injury. We stated that "'to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended.'" *Id.* at ¶ 56, quoting *Physicians Ins. Co. of Ohio v. Swanson*, 58 Ohio St.3d 189, 569 N.E.2d 906 (1991), syllabus. "Ohio courts will infer an intent to cause

injury from an intent to act only when 'the insured's intentional act and the harm caused are intrinsically tied so that the act has necessarily resulted in the harm." *Id.*, quoting *Allstate Ins. Co. v. Campbell*, 128 Ohio St.3d 186, 2010-Ohio-6312, 942 N.E.2d 1090, ¶ 48. We found that while the allegations of intentionally marketing and distributing opioids "may describe negligence or recklessness, * * * they do not rise to the level of claiming that DDM's intentional conduct was so intrinsically tied to causing harm that the intentional acts necessarily resulted in the harm." *Id.* at ¶ 58.

{¶ 75} In *Campbell*, the Ohio Supreme Court addressed the doctrines of "inferred intent" and "substantial certainty" in the context of intentional act exclusions in insurance policies and discussed "whether the rule of inferred intent should be extended to all torts where there is a substantial certainty of harm or limit its application * * *." *Id.* at ¶ 33. After reviewing the development of the inferred intent doctrine in Ohio, the *Campbell* Court held that as "applied to an insurance policy's intentional-act exclusion": (1) "the doctrine of inferred intent is not limited to cases of sexual molestation or homicide"; and (2) "the doctrine of inferred intent applies only in cases in which the insured's intentional act and the harm caused are intrinsically tied so that the act has necessarily resulted in the harm." *Id.* at paragraphs one and two of the syllabus.

{¶ 76} In making this decision, the *Campbell* Court considered but declined to adopt the "substantially certain" test in inferred-intent cases. *Id.* at ¶ 57. Under that test, a harm that was substantially certain to result from an intentional act

would fall under an intentional-acts exclusion of an insurance policy.  Instead, the *Campbell* Court held that for an act to fall within the doctrine, the harm must be the inherent result of an intentional act.  *Id.* at ¶ 56.  The court stated that because the inferred intent "test provides a clearer method for determining when intent to harm should be inferred as a matter of law, we hold that courts are to examine whether the act has necessarily resulted in the harm — rather than whether the act is substantially certain to result in harm."  *Id.* at ¶ 56.

{¶ 77}  In *Campbell*, the underlying act by the potential insureds was the placement of a Styrofoam target deer on a hilly country road at night.  *Id.* at ¶ 2.  A group of youths intentionally placed the deer in the roadway to watch the reactions of motorists.  *Id.*  Some motorists successfully avoided the fake deer, but one driver lost control of his vehicle and crashed; he and his passenger suffered serious injuries.  *Id.*  The court reasoned, "[w]hile the boys' act was ill-conceived and irresponsible and resulted in serious injuries, the action and the harm are not intrinsically tied the way they are in murder and sexual molestation."  *Id.* at ¶ 51.

{¶ 78}  The *NL I* Court used reasoning similar to Ohio law.  Because of the distinction between knowledge of the risk of hazardous consequences of one's actions and the intention to cause harm, the *NL I* Court found that the insurers failed to meet their summary judgment burden to exclude coverage on the basis of "expected or intended harms" and failed to make a prima facie case that NL's conduct is uninsurable under policies containing the exclusion.  *Id.* at *35.  The *NL I* Court found "there is no evidence demonstrating an intent to cause harm when NL

promoted the lead paint[.]" *Id.* at 38. The *NL II* Court affirmed this finding even though "NL had 'actual knowledge of the hazards of lead paint' and 'knew' that it would deteriorate and cause serious injury,'" and "NL's acts 'posed a serious risk of harm.'" The *NL II* Court held that "is not a clear finding that NL either expected or intended to harm any person or property." *Id.* at 2-3.

{¶ 79} In light of the Ohio Supreme Court's holding in *Campbell*, we find *NL I* analogous to Ohio law and look to the *NL* Action for guidance on the "intentional and expected acts" argument raised by the Insurers. Just as in *NL I*, we likewise find that the alleged intentional acts by Sherwin-Williams, which are the same alleged acts in the *NL* Action, are not expressly excluded by the policies and there is no evidence demonstrating that Sherwin-Williams intended to cause harm when it promoted the lead paint.

{¶ 80} While the *Santa Clara* Action found that Sherwin-Williams had actual knowledge of the hazards of lead paint and knew that it would deteriorate and cause serious injury, the action also found that Sherwin-Williams did not intend to harm children. Following the reasoning in *Campbell*, finding actual knowledge of a hazard is not the same as finding that Sherwin-Williams' intentional conduct and the resulting injuries were so intrinsically tied that Sherwin-Williams' conduct necessarily resulted in the harm.

{¶ 81} Like *NL I*, the question here is whether Sherwin Williams' act necessarily resulted in the harm, not whether Sherwin-Williams knew that its act was substantially certain to result in the harm. Because of this distinction, we find

that, under Ohio law, the Insurers failed to meet their burden on summary judgment.

{¶ 82} Therefore, the Insurers' first cross-assignment of error is overruled.

### 2. Public Policy and Intentional Torts

{¶ 83} In the second cross-assignment of error, the Insurers maintain that coverage is barred as a matter of public policy because Sherwin-Williams committed an intentional tort by promoting its paint with the knowledge that it caused harm. The Insurers challenge the trial court's finding that suggests Ohio's public-policy bar on coverage for intentional torts is limited to intentional torts in an employment context. The trial court stated, "The reliance of the series of cases generated as a result of *employment* intentional tort * * * do not have application to this case." (Emphasis added.) (Trial Court's Judgment Entry, Dec.4, 2020, pg. 5.) The court therefore found that the "discussions of intentional conduct contained in the coverage cases for employment intentional tort are of no relevance" because of a distinction between intentionally promoting a product and intending or expecting injury or property damage. (Trial Court's Judgment Entry, Dec.4, 2020, pg. 6.)

{¶ 84} The Insurers challenge the trial court's finding because, they contend, intentional torts are not limited to an employment context. The trial court, however, did not make that finding. Rather, the court stated that it declined to rely on cases that dealt solely with whether there was insurance coverage for intentional torts committed in an employment context. It never stated that an intentional tort could not apply outside an employment setting.

**{¶ 85}** Accordingly, the second cross-assignment of error is overruled.

### 3. Bodily Injury and Property Damage

**{¶ 86}** We now turn to the Insurers' third cross-assignment of error. Within the numerous insurance policies at issue in the case at hand, generally bodily injury and property damage are covered losses. The Insurers argue that the plaintiffs in the *Santa Clara* Action, which were all government entities, "did not suffer any bodily injury or property damage themselves." According to the Insurers, the "'plain meaning' of the term 'damages' is 'compensation for a loss of injury sustained by the plaintiff.'" Therefore, the Insurers argue, Sherwin-Williams' "liability falls outside of the insuring agreement * * *."

**{¶ 87}** Additionally, the Insurers argue that the Abatement Fund was not awarded because of bodily injury or property damage, because the government-entity plaintiffs "were not even required to establish that anyone suffered bodily injury or property damage" as part of a California public nuisance claim.

**{¶ 88}** Considering this argument, we look to the terms used in the insurance policies in question. Under one of the insurance policies found in the joint statement of undisputed facts, coverable damages are defined as "[a]ll sums which the Insured shall become legally obligated to pay as damages because of: bodily injury or property damage * * *." In this same exemplar policy, bodily injury is defined as "injury, sickness or disease sustained by any person which occurs during the policy period * * *." Property damage is defined as "(1) physical injury to or destruction of

tangible property which occurs during the policy period * * *, or (2) loss of use of tangible property * * * caused by an occurrence during the policy period."

{¶ 89} In *NL I*, the court addressed this argument and found as follows:

> While this court agrees that property damage and bodily injury are not elements of the representative public nuisance claim, there is a connection between the lead poison injuries to the children residing in the buildings containing the lead paints promoted by NL and the property damage to those buildings as a result of NL's promotion of lead paint.

*NL I* at 48.

{¶ 90} Upon review, we again follow the *NL I* Court and find that Sherwin-Williams' liability was imposed because of bodily injury or property damage. Therefore, the third cross-assignment of error is overruled.

### 4. Recoverable Damages

{¶ 91} In the fourth cross-assignment of error, the Insurers take issue with the trial court's statement that, but for the lack of "recoverable damages, there would be coverage under the insurance policies." The Insurers list various reasons why they believe they are entitled to summary judgment notwithstanding the recoverable damages issue. Given our disposition of Sherwin-Williams' sole assignment of error and our reversal of the trial court's granting summary judgment to the Insurers on appeal, as well as the fact that Sherwin-Williams does not ask this court to grant its motion for partial summary judgment, no coverage determination has been made in this case. Therefore, we sustain the fourth cross-assignment of error and remand this case to the trial court with instructions to vacate the statement at issue.

### 5. Duty to Defend

**{¶ 92}** The fifth cross-assignment of error relates to the trial court's finding that the Insurers "had a duty to defend Sherwin-Williams in the *Santa Clara* [Action]." Certain London Market Companies argues that this issue was not before the trial court, and as a result, the trial court erred in making this ruling.

**{¶ 93}** The duty to defend is not at issue in the case at hand and was not raised on summary judgment by any party. Certain London Market Companies expressly argues on appeal that all summary judgment motions filed in this case "involved only the distinct and different duty to indemnify." Therefore, we sustain the fifth cross-assignment of error and remand this case to the trial court with instructions to vacate the statement at issue.

## IV. Conclusion

**{¶ 94}** Therefore, based on the foregoing, we find that the trial court erred by granting summary judgment to the Insurers, and we sustain Sherwin-Williams' sole assignment of error. The Insurers' cross-assignments of error one, two, and three are overruled. As a matter of law, we find that (1) the Abatement Fund at issue in the case at hand constitutes damages under the Insurers' policies, and (2) Sherwin-Williams has presented an occurrence under the Insurers' policies. The trial court's decision granting summary judgment in favor of the Insurers is reversed. We note that a coverage determination in the instant case remains pending.

**{¶ 95}** This matter is remanded to the trial court to vacate the statements in its December 4, 2019 journal entry noted in cross-assignments of error four and five, and for further proceedings consistent with this opinion.

It is ordered that appellant/cross-appellee recover from appellees/cross-appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

LISA B. FORBES, J., CONCURS;
ANITA LASTER MAYS, J., DISSENTS

ANITA LASTER MAYS, J., DISSENTING:

**{¶ 96}** I respectfully dissent.

**{¶ 97}** I would find that collateral estoppel applies to all issues including damages. I would affirm the trial court's determination.

**{¶ 98}** I find that the salient issue in this appeal is whether nuisance abatement funds that Sherwin-Williams was ordered to pay by a California court constitute "damages" for purposes of insurance.

**{¶ 99}** In regard to "damages," Sherwin-Williams and the defendants contended that the abatement fund was "a thinly-disguised damages award to Plaintiffs for unattributed past harm to private homes." *Santa Clara II,* 17 Cal.App.5th 51, 227 Cal.Rptr.3d 499, at 568. The court of appeal found otherwise, however. Specifically, the court noted that abatement is "an equitable remedy," with the "sole purpose * * * to eliminate the hazard that is causing prospective harm to the plaintiff." *Id.* at 569. Therefore, the appellate court concluded that an abatement order "provides no compensation to a plaintiff for prior harm." *Id.* The government plaintiffs "did not seek to recover for any prior accrued harm nor did [they] seek compensation of any kind." *Id.* Rather, the monies the defendants deposited in the abatement fund "would be utilized not to recompense anyone for accrued harm but solely to pay for the prospective removal of the hazards defendants had created." *Id.*

**{¶ 100}** I agree with the insurers that Sherwin-Williams is collaterally estopped from relitigating the issue of damages in this case. In so finding, I also rely on the well-established principle that the duty to indemnify is triggered only after

liability has been established. *Ohio Govt. Risk Mgt. Plan v. Harrison*, 115 Ohio St.3d 241, 2007-Ohio-4948, 874 N.E.2d 1155; *see also Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St.3d 482, 2006-Ohio-6551, 861 N.E.2d 121 ("The duty to defend is based on the allegations presented. The duty to indemnify arises from the conclusive facts and resulting judgment. * * * The duty of defense is much broader than the duty of indemnification and can be invoked even though no liability is ultimately established.") (Citations omitted); *Cincinnati Ins. Co. v. DTJ Ents. (In re Hoyle)*, 143 Ohio St.3d 197, 2015-Ohio-843, 36 N.E.3d 122, ¶ 6 ("Unlike the broader duty to defend, an insurer's duty to indemnify its insureds is based on whether there is, in fact, actual liability.").